**LANDMARK INTERNATIONAL TRUCKS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 81–1599.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 1, 1982.

Decided Feb. 7, 1983.

John B. Rayson, Knoxville, Tenn., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, Paul Spielberg, N.L.R.B., Washington, D.C., for respondent.

Before LIVELY and MARTIN, Circuit Judges, and BROWN, Senior Circuit Judge.

LIVELY, Circuit Judge.

This case is before the court on a petition to review and set aside an order of the National Labor Relations Board, reported at 257 NLRB No. 170 (1981), and on the Board's cross-application for enforcement of its order.

I.

For many years International Harvester Co. (Harvester) owned and operated a truck sales and service dealership in Knoxville, Tennessee. On November 1, 1979 the petitioner Landmark International Trucks, Inc. (Landmark) purchased the Harvester dealership. Landmark made no changes in the services or products of the dealership, but did reduce the workforce. The service department employed 31 people on October 31, 1979. Thereafter Landmark operated the department with 18 employees, 17 of whom had been employed by Harvester.

Harvester had recognized Local Lodge 555 of the International Association of Machinists and Aerospace Workers (Local 555 or IAM) on March 29, 1977 as the representative of its service department employees and a collective bargaining agreement between the parties was in force at the time of the sale of the business to Landmark. On October 31, 1979 a representative of Local 555 wrote to Landmark "requesting a meeting with you for the purpose of representation and negotiations." By agreement the president of Landmark met with union representatives on November 15. The witnesses who attended the meeting agreed that it was a short "get acquainted" affair. The union representative stated that he wanted Landmark to recognize the union but that he had no documents prepared, and there was no discussion of substantive issues. The parties agreed to meet again on December 12. H.A. McClendon, Grand Lodge Representative of IAM, testified that he told the company president that the union would have specific proposals at a later meeting.

Following the meeting on November 15, Landmark's president Mayo Sydes met with the service department employees and told them of the discussions with the union representatives. Two service department employees then said, "in essence, 'We don't want to be in the union. How do we get out of the union?'" At this point, James Whaley, a service department employee, announced that he had a supply of resignation forms in his locker. After telling the employees who had spoken up that he would find out what their legal rights were Sydes left the meeting. James Whaley then spread the resignation forms on a table and told the employees to help themselves. Whaley testified that a number of employees completed withdrawal forms at that time and that he mailed them to the union.

On November 19 Landmark delivered a letter to all service department employees. The letter is reproduced as an appendix to

this opinion. In the letter Sydes advised the employees that they had a right to resign from the union and revoke their dues checkoff if they wished to do so. Two ways of resigning from the union were outlined. One way was by dating and signing two copies of a letter prepared by Landmark and enclosed with Sydes' letter and sending the signed copies by certified mail, one to the union and one to Landmark. Envelopes were furnished. The other way to resign, according to the letter, was by signing a union withdrawal slip and sending copies by certified mail to the union and to Landmark. In the letter of November 19 Sydes stated that he was writing in response to questions from a number of employees as to how they could resign from IAM. The letter emphasized that Landmark was neutral in the matter and that the employees had the right to decide for themselves whether or not to remain members of the union.

On December 4 Sydes wrote McClendon by certified mail, "The majority of employees in the Service Center have informed the Company that they have resigned their membership in the IAM. We understand this to mean that the service center employees no longer want to be represented by the IAM." Stating that Landmark believed it could not legally recognize the union as bargaining representative under these circumstances, Sydes canceled the meeting of December 12. At the hearing Sydes testified that he had received copies of letters of resignation from 13 of the 18 service department employees before December 4 and that James Whaley had told him that everyone in the department had resigned from the union. Whaley testified that prior to the sale of the business to Landmark a majority of the service department employees "had insinuated" that they no longer wanted to be represented by Local 555 and had asked him to obtain withdrawal forms for them. He received these forms on November 10 or 11 and put them in his locker. Sometime between the November 15 meeting and December 4 Whaley informed Sydes that all of the service department employees had returned withdrawal forms to him and that he had sent them in. He

and some of the other employees received "Honorary Withdrawal" cards from the union on November 20.

## II.

The regional director of the Board filed a complaint against Landmark on the basis of a charge dated April 1, 1980. Two unfair labor practices were charged: (1) Landmark violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by sending the letter of November 19, 1979 to the service department employees, and (2) Landmark violated § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), by withdrawing recognition of IAM as exclusive bargaining representative of the service department employees on December 4, 1979.

The hearing before an administrative law judge (ALJ) developed the facts as outlined in Part I. The ALJ upheld both unfair labor practice charges. He found that Landmark is a "successor" employer as that term is defined by case law and that, as such, it had an obligation to bargain with Local 555. Landmark does not dispute this finding. It is also undisputed that Landmark never agreed to the terms of the collective bargaining agreement between Harvester and IAM. The ALJ held the letter of November 19 to be coercive interference with the right of employees under § 7 of the Act, 29 U.S.C. § 157, to deal with their employer through representatives of their own choosing. Such interference is prohibited by § 8(a)(1) of the Act. The ALJ also held that Landmark had withdrawn recognition from the union in violation of § 8(a)(5) without establishing a reasonable, good faith doubt that the union continued to have the support of a majority of service department employees. "Therefore, I conclude and find respondent [Landmark] has failed to establish either that as of December 4, 1979, the Union did not in fact enjoy a majority status or that Respondent had reasonable grounds on that date for a good faith belief that the Union had lost its majority status."

The Board adopted most of the decision of the ALJ. However, it based its finding of an 8(a)(5) violation on somewhat different reasoning. It found that Landmark had "voluntarily" recognized Local 555 on November 15 and that it had violated its bargaining obligation by withdrawing from its commitment to recognize the union without affording a reasonable time for bargaining. The Board treated the obligation to bargain for a reasonable time as absolute, without regard to whether intervening events created a reasonable, good faith doubt concerning the majority status of the union.

In addition to requiring Landmark to cease and desist from interfering with its employees' exercise of § 7 rights and from refusing to recognize and bargain with the union the Board's order affirmatively required Landmark to recognize and bargain collectively with Local 555.

### III.

### A.

■ As a successor employer Landmark had a duty to recognize and bargain with Local 555, though it was not bound by the terms of the collective bargaining agreement between Harvester and IAM. *N.L. R.B. v. Burns Security Services,* 406 U.S. 272, 278, 281, 92 S.Ct. 1571, 1577, 1579, 32 L.Ed.2d 61 (1972). There is a presumption that the union with which the predecessor had a collective bargaining agreement continues to retain majority status. A change of ownership of the employer is not such an "unusual circumstance" as to affect a Board certification if a majority of the successor's employees in the unit are persons who were employed by the predecessor. *Id.* at 279, 92 S.Ct. at 1577; *Makela Welding, Inc. v. N.L. R.B.,* 387 F.2d 40, 46 (6th Cir.1967). The presumption of continued majority status is conclusive for one year following Board certification, but after one year the presumption is rebuttable. *N.L.R.B. v. Wayne Convalescent Center, Inc.,* 465 F.2d 1039, 1043 (6th Cir.1972); *N.L.R.B. v. Downtown Bakery Corp.,* 330 F.2d 921, 925 (6th Cir.1964).

The Board appears to have held in the present case that regardless of how long the union has been certified, a successor which "voluntarily" recognizes the union may not withdraw recognition for a reasonable time, regardless of the fact that it may have reasonable, good faith doubts about the continuing majority status of the union. We find no basis for such a holding. The cases cited by the Board were ones where a union was recently recognized by a settlement agreement on the basis of a card majority. Under these circumstances this court has held that an employer must bargain for a reasonable time without regard to the union's majority status. *E.g., N.L.R.B. v. Universal Gear Service Corp.,* 394 F.2d 396, 398 (6th Cir.1968); *Rogers Manufacturing Co. v. N.L.R.B.,* 486 F.2d 644, 647 (6th Cir.1973). Such cases involve truly voluntary recognition during an organizing campaign, and have no application to cases where a successor employer is required by law to recognize a union with which its predecessor had a collective bargaining agreement.

■ There is no reason to treat a change in ownership of the employer as the equivalent of a certification or voluntary recognition of a union following an organization drive. In the latter cases the employees must be given an opportunity to determine the effectiveness of the union's representation free of any attempts to decertify or otherwise change the relationship. However, where the union has represented the employees for a year or more a change in ownership of the employer does not disturb the relationship between employees and the union. While the relationship between employees and employer is a new one, the relationship between employees and union is one of long standing. A successor's duty to continue recognition under such circumstances is no different from that of any other employer after the certification year expires. Recognition under these circumstances carries with it no irrebuttable presumption of continued majority status. When a successor employer recognizes a union which has been certified as the exclusive representative of employees

of the predecessor employer for one year or more, there is a rebuttable presumption only that the union continues to have the support of a majority of the employees.

■ This court stated the obligation of a successor employer as follows in *Wayne Convalescent Center, supra,* 465 F.2d at 1043:

This presumption will bind a successor unless it demonstrates that the union no longer represents a majority of employees on the date of refusal to bargain, or that the refusal to bargain was grounded on good faith doubt of the union's majority status. (Citations omitted).

Once a successor employer forms a reasonable, good faith doubt as to the union's continuing majority status it is no longer bound to continue recognition and bargaining. *Cf. N.L.R.B. v. Downtown Bakery Corp., supra,* 330 F.2d at 925. If the union has been certified or voluntarily recognized by the predecessor for more than one year at the time of change of ownership, there is no reason to require the successor to continue recognition after it forms a reasonable, good faith doubt as to the union's continuing majority status.

### B.

In this court the Board argues, alternatively, that even if Landmark was not bound by an absolute duty to continue bargaining for a reasonable time, it acted illegally by withdrawing recognition without having an objective basis of reasonable, good faith doubt that the majority status of the union continued. The Board maintains that none of the indicia of loss of support by the union were sufficient in this case. The Board also contends that Landmark could not rely on responses to its November 19th letter, since it was an unfair labor practice to distribute the letter. Landmark responds that it had reasonable grounds for believing that the union had lost its majority status, and that its November 19th letter was a permitted communication under several Board decisions.

■ Our decisions establish that an employer may withdraw recognition after the first year of certification in either of two circumstances: if it can demonstrate by objective evidence that is "clear, cogent and convincing" either (a) that the union no longer has a majority, or (b) that it has a bona fide belief that the union no longer has the support of a majority of the employees. *N.L.R.B. v. Pennco, Inc.,* 684 F.2d 340, 342 (6th Cir.1982); *Thomas Industries, Inc. v. N.L.R.B.,* 687 F.2d 863, 867 (6th Cir.1982). Any unfair labor practice by the employer during the period of its determination of reasonable doubt "casts a shadow" on its claims of good faith. *Walker Die Casting, Inc. v. N.L.R.B.,* 682 F.2d 592, 595 (6th Cir.1982); *Rogers Manufacturing Co. v. N.L.R.B., supra,* 486 F.2d at 647. Once sufficient evidence has been presented to raise a reasonable doubt as to the continued majority status of a union the rebuttable presumption of majority support is overcome and the burden shifts to the General Counsel for the Board "to prove that on the critical date, the union in fact represented a majority of the employees." *Automated Business Systems v. N.L.R.B.,* 497 F.2d 262, 270 (6th Cir.1974), quoting *Lodges 1764 and 743, IAM v. N.L.R.B.,* 416 F.2d 809, 812 (D.C.Cir.1969). In this case the "critical date" is December 4, 1979, the day on which recognition was withdrawn.

### C.

The Board held that the November 19th letter violated § 8(a)(1). The Board did not consider the notices of resignation and revocation sent with the November 19th letter and signed by 13 service department employees to be evidence of a legitimate loss of majority status, since they flowed directly from an act found to be an unfair labor practice. If the November 19th letter was lawful, and Landmark was thus entitled to consider the 13 letters of resignation as objective evidence of loss of majority status, a different conclusion would be compelled. There were 18 employees in the service department bargaining unit. On December 4, in addition to the 13 resignation letters, Landmark relied on James Whaley's report that every employee in the

service department had resigned from the union. The ALJ found Whaley to be a credible witness, but treated this evidence as hearsay. Whaley's testimony at the hearing makes it clear that this report to Sydes was not hearsay. Whaley was not reporting what other people had told him. The employees had signed the resignation forms and given them to Whaley to transmit to the union. Whaley and all the second shift service department employees received "Honorary Withdrawal" cards from the union dated November 20, 1979.

The decisive issue is whether the November 19th letter violated § 8(a)(1). If it was not a violation, the 13 letters of resignation and checkoff revocation in conjunction with the questions from employees at the November 15th meeting and Whaley's report of resignations, demonstrated a good faith belief "supported by objective considerations which are clear, cogent and convincing." *Pennco, supra,* 684 F.2d at 342. *See Thomas Industries, Inc. v. N.L.R.B., supra,* 687 F.2d at 868 (a substantial decline in dues checkoff is the most probative evidence of loss of union support).

### IV.

#### A.

The ALJ held two Board opinions which approved employer letters similar to Landmark's November 19th letter to be "clearly distinguishable." *See Perkins Machine Company,* 141 NLRB 697 (1963); *Cyclops Corporation,* 216 NLRB 857 (1975). The Board "disavow[ed] the Administrative Law Judge's distinguishing of *Perkins* to the extent not consistent herewith." 257 NLRB No. 170, n. 1. Though it is not absolutely clear, the Board appears to hold that the letter of November 19 with the prepared response directed to the union and the employer would have been permissible if Landmark had had a valid reason for learning of the decision of an employee to resign from the union.

The letter of November 19 was obviously modeled after the letter which was approved in *Perkins.* However, there had

been no employee requests for information about resignation from the union in *Perkins.* There the employer acted on its own initiative in bringing to the attention of the employees the fact that the contract provided a short "escape period" during which employees could resign from the union and revoke dues checkoff authorization. In the present case the employer had greater justification for bringing to the attention of the employees their right to resign from union membership. At a meeting with service department employees where the matter of continued union representation came up Sydes was asked by two or more * of the employees how they could get out of the union. At the same meeting Whaley revealed that he had begun working on the matter and had obtained the necessary forms from Local 555. In *Cyclops,* a notice of withdrawal rights was approved though an employee request for information came shortly after a strike had ended and during a period when the union was disciplining some of its members for crossing picket lines. The Board brushed aside the obvious factual differences in the two cases and held that the decision in *Perkins* controlled *Cyclops.*

■ These decisions establish the rule that an employer may bring to the attention of its employees their right to resign from a union and to revoke dues checkoff authorizations so long as the communication is free from any threat or coercion. *See also, Triplett Corporation,* 234 NLRB 985 (1978), *enforcement denied,* 619 F.2d 586 (6th Cir.1980), where a non-coercive "notice to employees" advising of resignation and checkoff revocation rights was not challenged by the union. The November 19th letter is not coercive or threatening on its face. Sydes took pains to establish Landmark's neutrality on the issue of union representation and made it clear that no undesirable consequences would flow from an employee's decision, regardless of whether the employee chose to remain in the union or to withdraw. The letter set forth two methods of withdrawing from union membership without urging the use of one meth-

---

* Whaley testified that 3, 4 or 5 employees requested information.

od or the other. The fact that an employee might infer from the mere fact that such a letter has been sent that his employer "wants" the employees to withdraw from union membership is not sufficient ground for finding a letter coercive. *Cyclops, supra.*

The "rub" in the present case arises from the fact that Landmark directed the employees to notify it as well as the union of resignations and revocations. The Board argues that Landmark sought to "monitor" its employees' decisions while providing the means of resigning and insisting on its use. Landmark asserts that it wrote the letter in response to legitimate inquiries from employees. The Board approved the employers' supplying withdrawal forms in *Perkins* and *Cyclops,* which Landmark argues are indistinguishable in material aspects. Landmark contends that it was not guilty of unlawful interrogation in seeking to be informed of its employees' decisions.

### B.

■ The letter of November 19 was not a solicitation to the employees of Landmark to resign from the union. The employer's neutrality was clearly stated and the letter was a permitted response to legitimate inquiries. We conclude that the employer did not act unlawfully in enclosing a prepared form of withdrawal notice. This was approved in *Perkins.* The only question is whether it was wrong to require that the employer be notified of employee decisions. Though Landmark had not assumed the obligations of the collective bargaining agreement between Harvester and IAM, it did have on file dues checkoff authorizations from the service department employees. If it was continuing to deduct union dues and if Local 555 was continuing to accept dues payments from Landmark on behalf of service department employees, Landmark had a need to know if the employees desired to terminate their checkoff authorizations. The record is silent on these questions. We remand the case to the Board to make these factual determinations.

If dues checkoff was continued after Landmark succeeded Harvester on Novem-

ber 1, 1979, the requirement that resigning employees send copies of their resignations and dues checkoff revocations to the employer was permissible and there was no violation of § 8(a)(1). The receipt of copies of resignation and revocation letters from 13 of the 18 service department employees was reliable objective evidence that the union no longer had majority status. This together with the other information known to Landmark was sufficient to overcome the rebuttable presumption that majority status continued and to shift the burden to the General Counsel for the Board. The General Counsel presented no evidence that the union did retain a majority in fact. *See Automated Business Systems v. N.L.R.B., supra.* Thus if Landmark was entitled to rely on the copies of resignations, it demonstrated its good faith belief that the union had lost its majority status, and its withdrawal of recognition was not a violation of § 8(a)(5).

The decision of the Board is vacated, and the cause is remanded for further proceedings consistent with this opinion.

### APPENDIX

4550 Rutledge Pike ●      ● (615) 637–4881
Knoxville, Tennessee 37914

**LANDMARK INTERNATIONAL TRUCKS, INC.**

November    1979

A number of our employees have asked how they may resign from the Machinists Union. In response to those questions, I am writing this letter to explain how that may be done.

As you know, Landmark International began operating the Knoxville dealership on November 1, 1979. Before Landmark International took over, International Harvester notified the Machinists Union that it was terminating the labor contract covering the Knoxville Company branch as of October 31, 1979. There is no labor contract in effect between Landmark International and the Machinists Union at this time.

Under the law, all employees have the right to resign from the union and revoke their dues checkoff authorization at any time between termination of one labor contract and the signing of a new one.

Accordingly, you can resign from the union and revoke your checkoff authorization at this time if you wish to do so.

The decision is yours to make. Landmark International simply wanted to be sure that you know about, and understand, your rights and privileges. Whether you resign from the union or remain a union member will not make any difference in your wages, benefits, position or treatment by the Company.

If you want to resign from the union, there are two ways you can do it. One way is to follow these three steps.

1. Date and sign two copies of the enclosed letter addressed to Landmark International and the union. (Keep the third copy for yourself.)

2. Mail the two signed copies—one to Landmark International and one to the union—in the enclosed envelopes.

3. Be sure to send the letter by certified mail.

The other way to resign from the union is to sign a union withdrawal slip and send a copy of it by certified mail to the Company and the union.

Landmark is not urging you either to remain a member of the union or to resign from the union. As far as the Company is concerned, this is a matter for you to decide for yourself without pressure from either the Company or the union.

Sincerely,
LANDMARK INTERNATIONAL
TRUCKS, INC.
/s/ C. MAYO SYDES
C. Mayo Sydes, President

CMS:vi
Enclosures

Landmark International Trucks, Inc.
4550 Rutledge Pike
Knoxville, Tennessee 37914

Mr. H.A. McClendon
Grand Lodge Representative
International Association of Machinists
and Aerospace Workers
4704 Maywood Lane
Chattanooga, Tennessee 37416

Dear Sirs:

I am hereby notifying you that I revoke my authorization for deduction of Union Dues from my wages and I hereby resign my membership in the Union.

Yours truly,

Certified Mail