**ADAIR STANDISH CORPORATION, Petitioner and Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent and Cross–Petitioner.**

**Nos. 89–5045, 89–5273, 89–5441, 89–5902 and 89–6106.**

United States Court of Appeals, Sixth Circuit.

Argued April 30, 1990.

Decided Aug. 24, 1990.

---

**3.** Rule 7054(a) provides:
 *(a) Judgments.* Rule 54(a)–(c) F.R.Civ.P. applies in adversary proceedings.

Bankr. R.P. 7054(a).

Francis T. Coleman (argued), Keck, Mahin & Cate, Washington, D.C., for Adair Standish Corp.

Aileen A. Armstrong, Deputy Associate Gen. Counsel, Paul Spielberg, Charles P. Donnelly, Jr., Fred L. Cornnell, Jr. (argued), Leizer Goldsmith, Linda Dreeben, Peter Winkler, William Stewart, John Burgoyne, and Nancy Hunt, N.L.R.B., Office of Gen. Counsel, Washington, D.C., and Bernard Gottfried, Regional Director, N.L.R.B., Region 7, Detroit, Mich., for N.L.R.B.

Before GUY and NELSON, Circuit Judges; and EDWARDS, Senior Circuit Judge.

RALPH B. GUY, Jr., Circuit Judge.

Adair Standish Corporation (Adair) appeals from decisions and orders of the National Labor Relations Board (NLRB or Board) entered on July 29, 1988, *see Adair Standish Corp.*, 290 N.L.R.B. No. 43, 130 L.R.R.M. (BNA) 1304 (1988), and February 8, 1989, *see Adair Standish Corp.*, 292 N.L.R.B. No. 101, 130 L.R.R.M. (BNA) 1345 (1989), while the NLRB seeks enforcement of both the 1988 and 1989 orders. The 1988 NLRB order determined that Adair committed numerous violations of sections 8(a)(1), (3), and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1), (3), and (5), during and after a successful union campaign at Adair's printing plant in Standish, Michigan. The Board's 1989 order adopted *in toto* the decision of an Administrative Law Judge (ALJ) establishing additional violations of section 8(a)(5) of the NLRA by Adair. Because we find that both orders are supported by substantial evidence and in accordance with law, we affirm the Board's findings with respect to all of the NLRA violations. Insofar as the relief ordered by the Board is concerned, we vacate and remand for additional factual findings the directive that Adair's reconditioned press be shipped to the company's Standish plant, and affirm the relief awarded in all other respects.

I.

Adair, a Michigan corporation headquartered in Southfield, has performed printing work in Michigan at both its Dexter and Standish plants since 1976. The Dexter

plant, which employs approximately 65 non-unionized workers, serves as Adair's principal printing facility and contains the equipment necessary for specialized jobs. The Standish plant, where 37 unionized employees work, primarily provides long-term, high-volume production of service manuals, catalogues, and booklets for the automotive industry.

In 1984, before the Standish workforce became unionized, Adair management made plans to increase production capacity at the Standish plant by trading in an antiquated Color King printing press for a reconditioned Goss H.V. press. Adair ultimately placed an order for the Goss press with Rockwell Graphic Systems, Inc. (Rockwell), on March 29, 1985. Although Rockwell agreed to provide the reconditioned Goss press to Adair by June of 1985, Rockwell subsequently rescheduled delivery of the press for September 1985. Meanwhile, Adair lost several significant printing contracts tentatively scheduled for production at the Standish plant.

On July 15, 1985, at the behest of a majority of the workers at the Standish plant, Flint Local 282–C, Graphic Communications International Union, AFL–CIO (the Union), filed with the NLRB a petition for certification of representation concerning Adair's Standish printing facility. Upon receipt of notification from the Board, Adair management resolved to oppose the Union. Soon after the Union filed its petition with the NLRB, the acts underlying the charges at issue in this matter began to occur.[1]

Between July and September of 1985, Adair supervisor Calvin Ireland told several employees that the Goss press would not be shipped to Standish because of the unionization campaign. The Board characterized this conduct as violative of section 8(a)(1) of the NLRA.[2]

A representation election held on September 11, 1985, resulted in a 25 to 11 vote in favor of the Union.[3] Immediately after the election, two employees inquired about revoking their union authorization cards. The company responded on September 13, 1985, by posting a notice that stated: "Anyone who is interested in revoking their authorization card which you signed prior to the election may do so by obtaining a request form from your supervisor." After Adair posted the notice, supervisor Ireland admittedly "took it upon himself" to "let the employees know that [he] had forms to fill out to revoke their authorization cards." The Board found that this conduct, particularly in light of its timing, violated section 8(a)(1) of the NLRA "because it did not merely advise employees of their legal rights, but rather solicited them to revoke their authorization cards."

In addition to the notification on revoking union authorization cards, Adair posted a separate notice on September 13, 1985, articulating a stringent tardiness policy that stated as follows:

Now that the election is behind us, we can go back to "business as usual." I have been trying to be very careful in these past few months to make sure no one felt like he or she was being singled out for discipline because of his or her views on unionism.

As a result, I have no[t] enforced some of our Company policies as strictly as I have in the past—especially the Company

---

1. Details of the events at issue are derived from the Board's decisions and orders as well as the ALJs' rulings as adopted by the Board. Although Adair contests several aspects of the Board's factual conclusions, " 'it is the Board's function to resolve questions of fact and credibility where there is a conflict in the testimony.' " *Kux Mfg. Co. v. NLRB,* 890 F.2d 804, 808 (6th Cir.1989). Accordingly, we shall set forth the facts as determined by the Board and address Adair's objections in due course.

2. According to section 8(a)(1), "[i]t shall be an unfair labor practice for an employer to inter-fere with, restrain, or coerce employees in the exercise of the rights [to form, join, and assist labor organizations] guaranteed in [29 U.S.C. § 157]." *See* 29 U.S.C. § 158(a)(1).

3. Adair filed objections to the election result and pursued its charges through the NLRB to this court. We rejected Adair's petition to decertify the Union and granted the Board's petition for enforcement of its order commanding Adair to cease and desist violating the NLRA and bargain with the Union. *NLRB v. Adair Standish Corp.,* 875 F.2d 866 (6th Cir.1989).

attendance policy. It is important for everyone to be at work *on time* each day. Failure to do so without prior authorization from someone in management *will* result in disciplinary action immediately.

When you don't show up on time it puts that much more of a burden on us as well as all of your fellow workers. This isn't fair to the people who are dedicated to making the Company work. Thank you for your cooperation.

The Board ruled that Adair's decision to institute the strict new policy immediately after the election violated section 8(a)(3) of the NLRA.[4] Moreover, the Board determined that Adair's unilateral promulgation of the tardiness policy contravened the company's obligation to bargain with the Union under section 8(a)(5).[5] Less than one week after the tardiness policy was posted, Edward Lachcik received a two-day suspension for "third notice of lateness" and Tim Cummings was given a written warning stating, "You must be here on time!" The Board characterized the Cummings warning as a section 8(a)(3) violation and the Lachcik suspension as a transgression of sections 8(a)(1) and (3).

On September 25, 1985, Adair laid off two employees, Larry Foster and Cynthia Johnson, for economic reasons. Although the Board did not find these lay-offs impermissibly gauged to discourage union membership in violation of section 8(a)(3), the Board did rule that the lay-offs contravened Adair's section 8(a)(5) duty to bargain with the Union.

As a result of the company's formal challenges to the outcome of the certification election, the Board scheduled an October 23, 1985, hearing to assess Adair's objections. On the eve of the hearing, Adair's attorneys interviewed employee Carol Barber. The Board acknowledged that management had the authority to ask questions necessary to prepare for the hearing, but concluded that the attorneys nonetheless violated section 8(a)(1) of the NLRA by failing to observe the clearly defined safeguards applicable to such interviews.

By January of 1986, Adair began reassessing its plan to install the Goss H.V. press purchased from Rockwell at the Standish facility. Adair advertised the press in March of 1986, received several inquiries from prospective buyers, but decided to keep the press in storage. In May of 1986, the company installed the press in its Dexter plant and transferred a smaller Suburban press from Dexter to Standish. Adair explained that its reconsideration of the plans for the Goss H.V. printer was motivated solely by business concerns. The Board critically examined this rationale and balanced the company's assertions against testimony from various Standish workers that Adair supervisors attributed the change in plans to unionization. The Board found that the timing of the change in plans coupled with the comments of Adair supervisors indicated that the decision to install the Goss press in Dexter was motivated by anti-union animus. The Board further ruled that the absence of the Goss press at the Standish plant adversely affected the unionized Standish employees' terms and conditions of employment. Accordingly, the Board declared the shipment of the press to Dexter violative of sections 8(a)(1) and (3) of the NLRA.

Beginning in August 1986, Adair management unilaterally implemented several significant changes in work schedules and conditions at the Standish plant. The company instituted a series of economic layoffs using ability, rather than seniority, as the criterion for selecting employees for lay-off. In October of 1986, Adair discontinued its press department second shift and switched all second shift employees to the day shift. The company changed from a eight-hour, five-day workweek to a ten-hour, four-day workweek in October 1986,

---

**4.** Section 8(a)(3) provides in pertinent part that "[i]t shall be an unfair labor practice for an employer by discrimination in regard to ... any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3).

**5.** Pursuant to section 8(a)(5), "[i]t shall be an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees[.]" 29 U.S.C. § 158(a)(5).

and then returned to a five-day workweek three months later. Finally, in 1986, Adair stopped furnishing turkeys to its employees on Christmas Eve, choosing to give the employees the day off instead. Because the company took each of these actions without giving prior notice to the Union, the Board ruled that Adair violated section 8(a)(5) in each instance.

To remedy the NLRA violations documented in the 1988 and 1989 decisions, the Board issued cease-and-desist orders directed at a broad range of conduct and required Adair to post NLRB-approved notices at the Standish plant. In addition, the Board ordered Adair to transfer the Goss press from the Dexter facility to the Standish plant. The Board further instructed Adair to provide make-whole relief in the form of backpay to all employees whom the company unilaterally laid off in violation of its duty to bargain. The Board further decreed that the employees disciplined under the September 13, 1985, tardiness policy should be made whole and should have all disciplinary forms resulting from the policy expunged from their employment records.

■ On appeal, Adair challenges the Board's rulings as well as the relief provided by the Board's orders. "The scope of our review of Board findings is well-established: Where there is substantial evidence in the record as a whole to support the Board's conclusions, they may not be disturbed upon appeal." *Kux Mfg. Co. v. NLRB*, 890 F.2d 804, 808 (6th Cir.1989). Thus, the Board's findings of fact and its "application of the law to the facts" are subject to the substantial evidence test. *NLRB v. Ohio Masonic Home*, 892 F.2d 449, 451 (6th Cir.1989). " 'Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision.' " *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1262 (6th Cir.1988) (quoting *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir.1987)). Applying these standards,

we shall initially address the Board's findings that Adair violated sections 8(a)(1), (3), and (5) of the NLRA in various respects. We then shall consider the propriety of the remedial orders in light of the Board's "primary responsibility and broad discretion to devise remedies that effectuate the policies of the [NLRA], subject only to limited judicial review." *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 898–99, 104 S.Ct. 2803, 2812–13, 81 L.Ed.2d 732 (1984); *accord Van Dorn Plastic Mach. Co. v. NLRB*, 881 F.2d 302, 308 (6th Cir.1989) (*Van Dorn II.*)

II.

Section 8(a)(1) of the NLRA expressly forbids an employer such as Adair "to interfere with, restrain, or coerce employees in the exercise of the rights" to "self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection[.]" 29 U.S.C. §§ 157, 158(a)(1). As we explained in *NLRB v. Okun Bros. Shoe Store, Inc.*, 825 F.2d 102 (6th Cir.1987), *cert. denied*, 485 U.S. 935, 108 S.Ct. 1109, 99 L.Ed.2d 270 (1988), "[t]he test for determining whether an employer has violated section 8(a)(1) is whether the employer's conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *Id.* at 105. The determination is based upon "the total context in which the challenged conduct occurs" viewed "from the standpoint of its impact upon the employees." *See id.*

A.

■ The first section 8(a)(1) violation challenged by Adair concerns supervisor Ireland's statements prior to the union election that the company might cancel delivery of the press due to unionization activity.[6] Adair contends that the record does not contain substantial evidence indicating

---

6. A similar remark was attributed to supervisor Richard Livingstone, but the Board found it "unnecessary to pass on the legality of [Livingstone's] statement because the finding of an additional violation [beyond Ireland's com-

ments] would be essentially cumulative and would not materially affect the Order." Accordingly, we need not consider Adair's contention that the Board erred in predicating section 8(a)(1) liability upon Livingstone's remark.

that Ireland made such threatening statements. We disagree. Employee Larry Foster testified that Ireland made comments linking the scheduled arrival of the press to unionization. Ireland stated that he might have told Foster that the press was coming to Standish, but denied tying the press to union activity. The ALJ, whose opinion the Board adopted, credited Foster's testimony over Ireland's responses. As we have repeatedly emphasized, " 'it is the Board's function to resolve questions of fact and credibility where there is a conflict in the testimony.' " *Kux Mfg.*, 890 F.2d at 808. Here, as in *NLRB v. Baja's Place*, 733 F.2d 416 (6th Cir.1984), the ALJ "commented at length about the general credibility of each witness and gave succinct reasons for his determinations of relative validity of each witness' testimony." *Id.* at 421. Therefore, the Board's finding that Ireland made the contested statement is "supported by substantial evidence and must be upheld." *See id.*

We also accept the Board's conclusion that Ireland's comments were sufficiently coercive to be actionable under section 8(a)(1). We have observed that "[i]n several cases where the defendant employer has asserted that particular statements were opinions and not threats, courts of appeals have upheld the Board order based upon the reasonable inference by employees that such statements were directed toward their decision to join the union." *Okun Bros.*, 825 F.2d at 107 (collecting cases). "Only where the threats or opinions refer to matters over which the speaker has no control may employees not reasonably conclude that they are being coerced." *Id.* In this case, Foster clearly could have believed that Ireland had some ability to influence the delivery of the press to Standish. Accordingly, we find that "substantial evidence" supports the Board's determination that Ireland's conduct violated section 8(a)(1).

### B.

■ Adair also disputes the Board's finding that the posting of a notice apprising union members of their right to revoke their authorization cards violated section 8(a)(1). We have clearly indicated that "[i]t is a violation of Section 8(a)(1) of the [NLRA] for an employer to sponsor and participate in the circulation or a petition among employees withdrawing support from a union." *NLRB v. Allen's I.G.A. Foodliner*, 651 F.2d 438, 440 (6th Cir.1981). Conversely, in *Landmark Int'l Trucks, Inc. v. NLRB*, 699 F.2d 815 (6th Cir.1983), we reasoned that "an employer may bring to the attention of its employees their right to resign from a union ... so long as the communication is free from any threat or coercion." *Id.* at 820. Here, the employer's conduct falls between the impermissible activity described in *Allen's I.G.A.* and the permissible conduct contemplated in *Landmark.*

Although Adair defines its behavior as innocuously informative, we find that the Board correctly sanctioned the company for violating section 8(a)(1) with respect to revocation of union authorization. Here, following the posting of the notice, supervisor Ireland admittedly "took it upon himself" to "let the employees know that [he] had forms to fill out to revoke their authorization cards." These solicitations demonstrate that the company voluntarily "offered both the method and the means to withdraw from the union" and encouraged consideration of this option. *Peabody Coal Co. v. NLRB*, 725 F.2d 357, 364 (6th Cir. 1984) (finding section 8(a)(1) violation). In addition, the timing of the company's decision to post the notice—two days after the election and on the same day as the posting of the strict tardiness policy—undermines the beneficent rationale advanced by the company to justify its action. *See, e.g., NLRB v. Garon*, 738 F.2d 140, 144 (6th Cir.1984).

### C.

■ Adair next contests the Board's finding of a section 8(a)(1) violation in connection with the interview of employee Carol Barber by company attorneys. Adair aptly notes that it was "privileged to interview employees for the purpose of discovering facts relevant to issues raised in

[the] unfair labor practice case to aid in preparation of the case." *Anserphone, Inc. v. NLRB*, 632 F.2d 4, 6 (6th Cir.1980); *see also Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1193 (6th Cir.1985). In this case, however, Adair attorneys conceded that they questioned Barber and other employees about who belonged to the Union and who contacted the Union, thereby improperly and unnecessarily " 'pry[ing] into matters of union membership[.]' " *Southern Moldings, Inc. v. NLRB*, 715 F.2d 1069, 1073 n. 5 (6th Cir.1983), *reaff'd*, 728 F.2d 805, 806 (6th Cir.1984) *(en banc)* ("For the same basic reasons stated by the panel decision, we find substantial evidence in the record to support the Board's unfair labor practices findings and conclusions."); *see also Suprenant Mfg. Co. v. NLRB*, 341 F.2d 756, 763 (6th Cir.1965). Moreover, company attorneys admitted that they neglected to "adequately inform several employees of the voluntary nature of the interrogations[,]" which we have categorized as "a clear violation of Section 8(a)(1) of the [NLRA]." *Southern Moldings*, 715 F.2d at 1073 n. 5. Accordingly, we find that substantial evidence supports the Board's ruling that Adair violated section 8(a)(1) in the course of questioning Carol Barber.

## III.

Pursuant to section 8(a)(3) of the NLRA, an employer commits an unfair labor practice "by discriminat[ing] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization[.]" 29 U.S.C. § 158(a)(3). To establish a violation of section 8(a)(3), the Board's general counsel must "make a prima facie showing sufficient to support the inference that protected conduct was a 'motivating factor' in the employer's decision." *Lawson Co. v. NLRB*, 753 F.2d 471, 476 (6th Cir.1985). "Once this is established, the burden will shift to the employer to demonstrate that the same action would have taken place even in the absence of the protected conduct." *Id.; accord NLRB v. Transportation Mgmt. Corp.*, 462 U.S. 393, 400–03, 103 S.Ct. 2469, 2473–75, 76 L.Ed.2d 667 (1983). In ascertaining the

employer's motivation, "[t]he Board may rely on all the evidence, including direct admissions as well as circumstantial evidence[.]" *Turnbull Cone Baking Co. of Tennessee v. NLRB*, 778 F.2d 292, 297 (6th Cir.1985), *cert. denied*, 476 U.S. 1159, 106 S.Ct. 2277, 90 L.Ed.2d 720 (1986). In *Turnbull Cone*, we unequivocally established that "[c]ircumstantial evidence alone may be sufficient" to prove a section 8(a)(3) transgression. *Id.*

### A.

■ Adair challenges the Board's section 8(a)(3) finding with respect to the tardiness policy and resulting disciplinary actions by contending that the formal policy antedated the union election. The Board found that the evidence supports a contrary conclusion, and we agree. Adair had never posted a policy on attendance prior to the union election, and the company's general approach to discipline for tardiness prior to the election was, at best, capricious and vague. More importantly, Adair's decision to post the tardiness policy (along with the union authorization revocation notice) immediately after the union election belies the company's assertion that the posted policy was nothing more than a formal statement of existing protocol. *See, e.g., NLRB v. E.I. DuPont de Nemours*, 750 F.2d 524, 529 (6th Cir.1984) ("Antiunion motivation reasonably may be inferred from ... proximity in time between the employee's union activity and his discharge[.]"). In sum, we find that substantial evidence supports the Board's conclusion that Adair promulgated a new policy when it posted its written statement on tardiness in the aftermath of the election.

We likewise find substantial evidence underlying the Board's determination that Adair employees Lachcik and Cummings were disciplined for violating the tardiness policy in contravention of section 8(a)(3). Both employees, as the ALJ observed, were well-known union adherents. Under the circumstances, "[a]ntiunion motivation reasonably may be inferred from [Adair's] expressed hostility towards unionization com-

bined with knowledge of the employee[s'] union activities[.]" *DuPont,* 750 F.2d at 529. That the company chose to impose penalties upon Lachcik and Cummings soon after the election for behavior that previously had been condoned through inaction strongly suggests improper motivation. *See, e.g., NLRB v. Gold Standard Enters., Inc.,* 679 F.2d 673, 679 (7th Cir.1982).

### B.

■ Insofar as the decision to install the Goss H.V. press at the Dexter plant is concerned, Adair adamantly contests the Board's finding of discriminatory motivation violative of section 8(a)(3). Under the analytical approach that the Supreme Court approved in *Transportation Mgmt.,* 462 U.S. 393, 103 S.Ct. 2470, the Board's general counsel had to "show the employee[s'] protected activity formed a motivating factor" in Adair's decision to install the Goss H.V. press in Dexter rather than in Standish. *See, e.g., NLRB v. Oberle–Jordre Co.,* 777 F.2d 1119, 1121 (6th Cir.1985); *Lawson,* 753 F.2d at 476. The Board ruled that this burden was satisfied, and we find that substantial evidence supports this determination. During the union campaign in 1985, supervisor Ireland indicated that the company's plan to install the press in the Standish plant could well be revised because of union activity. Supervisor Richard Livingstone essentially corroborated this sentiment in July of 1986 soon after the press was installed in the Dexter facility. Specifically, Livingstone told two employees that they should have waited to begin their union campaign because the Standish plant had lost the Goss H.V. press as a consequence of union activity. *Cf. Turnbull Cone,* 778 F.2d at 297 (characterizing statements by "employer's representatives" as "especially persuasive evidence"). Moreover, the timing of Adair's decision to store the press pending shipment to Dexter in contravention of the purchase order's designation of Standish as the delivery point suggests that anti-union animus played some role in the company's decision. *See Turnbull Cone,* 778 F.2d at 297 (citing *DuPont,* 750 F.2d at 529, and *Garon,* 738 F.2d at 147).

Because the threshold showing of anti-union animus was made, Adair had to establish that the Goss H.V. press would have been installed in Dexter, rather than Standish, absent the union activity. *See Oberle–Jordre,* 777 F.2d at 1121. The Board decided that Adair failed to carry this burden despite the company's presentation of evidence suggesting that economic factors supported the decision. Robert Adair, the company president, testified that the loss of business in mid–1985 prevented the company from installing the press in Standish. The Board rejected this explanation for three reasons. First, the Board concluded that the conditions allegedly mandating the change in plans for the press were known to the company when they instructed Rockwell to deliver the press to Standish. Second, the Board expressed skepticism about Adair's financial assertions based upon the company's "failure to substantiate its economic claim by producing full and complete evidence" concerning the operations of either the company as a whole or the Standish plant. *Cf. NLRB v. Price's Pic–Pac Supermarkets, Inc.,* 707 F.2d 236, 240 (6th Cir.1983) (discounting employer's statements where employer "failed to present either to the ALJ or to the Board the financial records relied upon in making the statements in question"). Finally, Adair's economic arguments, which might have justified the sale or refusal to take delivery of the printer in order to reduce capacity, could not support the company's willingness to take delivery of the machine at Dexter, thereby increasing production capacity. *Cf. NLRB v. Health Care Logistics, Inc.,* 784 F.2d 232, 237 (6th Cir.1986) (rapid replacement of discharged employees, "despite continued economic problems, . . . supports a finding that financial woes were not the reason for the discharge"). Although the record does substantiate the company's position on this issue to some degree, the Board's resolution is, in our view, supported by evidence that "is adequate, in a reasonable mind, to uphold the [Board's] decision." *See Emery Realty,* 863 F.2d at 1262. Accordingly, we accept the Board's finding that Adair's re-

location of the Goss H.V. press constituted a section 8(a)(3) violation.

## IV.

Section 8(a)(5) of the NLRA dictates that an employer's "refus[al] to bargain collectively with the representatives of his employees" constitutes an unfair labor practice. *See* 29 U.S.C. § 158(a)(5). As we explained in *NLRB v. Allied Prods. Corp.*, 548 F.2d 644 (6th Cir.1977), "[i]t is the election—the choice of the union as the employees' bargaining representative—that gives rise to the employer's duty to bargain." *Id.* at 653. "The duty 'to bargain collectively' enjoined by § 8(a)(5) is defined by § 8(d) as the duty to 'meet ... and confer in good faith with respect to *wages, hours, and other terms and conditions of employment.*'" *NLRB v. Katz*, 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962) (emphasis added); *accord NLRB v. Pepsi–Cola Distrib. Co. of Knoxville, Tennessee, Inc.*, 646 F.2d 1173, 1175 (6th Cir.1981), *cert. denied*, 456 U.S. 936, 102 S.Ct. 1993, 72 L.Ed.2d 456 (1982). As this language suggests, an employer is obligated to bargain over nothing more than "wages, hours, and other terms and conditions of employment." *See First Nat'l Mgmt. Corp. v. NLRB*, 452 U.S. 666, 674–76, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981); *accord NLRB v. Plymouth Stamping Div., Eltec Corp.*, 870 F.2d 1112, 1115 (6th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 235, 107 L.Ed.2d 186 (1989). In *Plymouth Stamping*, we observed that "Congress deliberately used the somewhat vague phrase 'conditions of employment' in defining mandatory bargaining subject matter to allow the Board substantial latitude to define the scope of mandatory bargaining in light of industrial realities and practices." *Plymouth Stamping*, 870 F.2d at 1115. "Because Congress vested the Board with primary responsibility for determining whether bargaining subjects are 'terms and conditions of employment,' the Board's decision as to exactly which disputes are mandatory bargaining subjects is entitled to 'considerable deference.'" *Id.* With these principles and caveats in mind, we must decide whether the Board correct-ly found that Adair committed several section 8(a)(5) violations following the September 11, 1985, election.

## A.

■ Adair contends that the Board erred in finding a section 8(a)(5) violation predicated upon the tardiness policy posted on September 13, 1985. In support of this position, Adair asserts that the tardiness policy predated the election, and thus could be retained without bargaining. The Board flatly rejected the company's underlying premise that the tardiness policy issued in the wake of the election was nothing more than a formal statement of preexisting standards. As we previously ruled, substantial evidence supports the Board's determination that Adair promulgated a new policy when it posted its statement on tardiness in September of 1985. The Board's ruling is bolstered by both the timing of the company's action, *see, e.g., DuPont*, 750 F.2d at 529, and the company's failure to systematically discipline employees for tardiness at any time prior to the election. Therefore, we accept the Board's ruling that Adair violated section 8(a)(5) by unilaterally issuing its disciplinary policy regarding tardiness, which clearly governed a "term" or "condition" of employment. *See, e.g., S.S. Kresge Co. v. NLRB*, 416 F.2d 1225, 1230 n. 9 (6th Cir.1969).

## B.

■ Adair further argues that it was acting within its section 8(a)(5) rights in 1986 when it eliminated the second shift at the Standish plant, changed from a five-day workweek to a four-day workweek and then returned to a five-day week three months later, and modified the vacation schedule. Although such changes unquestionably pertained to "wages, hours, and other terms and conditions of employment," the company contends that all of the schedule modifications were made to accommodate the employees, and thus not unilateral. "[T]he fact that the Company obtained the approval of a majority of its employees for its proposed modifications"

does not relieve the company of its bargaining obligation or absolve the company of section 8(a)(5) liability. *NLRB v. Ford Bros., Inc.*, 786 F.2d 232, 233 (6th Cir.1986). Accordingly, we find ample support for the Board's ruling that Adair violated section 8(a)(5) by instituting various schedule changes in 1986.

## C.

■ The final section 8(a)(5) violation at issue concerns Adair's lay-off policy. The evidence of record clearly indicates that the company chose to lay off employees based on subjective assessments of merit rather than seniority or some other objective criterion. This practice continued without bargaining after the election on September 11, 1985, contrary to our unmistakable pronouncement that "certain decisions, 'such as the order of succession of layoffs and recalls,' ... are at the core of the employer-employee relationship properly subject to mandatory bargaining." *Plymouth Stamping*, 870 F.2d at 1115 (quoting *First Nat'l Maintenance*, 452 U.S. at 677, 101 S.Ct. at 2580). In this respect, Adair's unilateral maintenance of its lay-off policy following the election directly contravened section 8(a)(5).

To justify its lay-off policy, Adair argues that the postelection policy amounted to nothing more than a permissible "continuation of the status quo...." *See Katz*, 369 U.S. at 746, 82 S.Ct. at 1113. This argument unjustifiably presumes that the company's lay-off practice prior to the election was systematic, as opposed to sporadic. Here, as in *Local 512, Warehouse and Office Workers' Union v. NLRB*, 795 F.2d 705 (9th Cir.1986), the layoffs were "unpredictably episodic" as well as *"ad hoc* and highly discretionary[.]" *Id.* at 711. Thus, the *Katz* exception for practices which are "mere continuation[s] of the status quo" has no application in this case. *See Local 512*, 795 F.2d at 711 (discussing *Katz*, 369 U.S. at 746–47, 82 S.Ct. at 1113–14).

Adair further suggests that its lay-off policy falls "within a recognized exception to the bargaining requirement, which permits unilateral changes based on 'compelling economic considerations.'" *Van Dorn Plastic Mach. Co. v. NLRB*, 736 F.2d 343, 349 (6th Cir.1984) *(Van Dorn I)*, cert. denied, 469 U.S. 1208, 105 S.Ct. 1173, 84 L.Ed.2d 323 (1985). If the Board's decision were limited to the mere act of laying off workers, we might find some merit in the company's argument. However, Adair concedes that its lay-off policy is based entirely upon subjective factors. Thus, as the Board aptly observed, Adair's asserted right to unilaterally lay off workers encompasses the right to do so on unspecified terms dictated by the company itself. While lay-offs as a general principle may be compelled by economic conditions, Adair cannot seriously contend that financial considerations mandate unilateral departure from a more traditional lay-off system based upon seniority or some other objective factor. Accordingly, we accept the Board's conclusion that economic constraints did not entitle the company to maintain an *ad hoc*, subjective lay-off policy without bargaining over such a program. *Cf. Van Dorn II*, 881 F.2d at 308 (filing insufficient proof of "compelling economic considerations" where employer "demonstrated, at best, only that it had made a prudent business decision, rather than one made under 'extraordinary economic compulsion'").

## V.

Having affirmed the Board's findings with respect to each violation of the NLRA, we must consider whether the Board's remedial orders are proper. Our review is circumscribed by the principle that "[a] remedial order of the Board will not be disturbed 'unless ... the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [NLRA].'" *Van Dorn II*, 881 F.2d at 308–09. The deference necessarily accorded to remedial orders stems from the Board's "primary responsibility and broad discretion to devise remedies" for NLRA violations. *See Sure–Tan*, 467 U.S. at 898, 104 S.Ct. at 2812. Although the Board ordered sweeping relief in this

case including cease-and-desist orders and the posting of notices, Adair's challenge to the multifaceted remedial orders focuses upon the directives to provide employees with backpay and to transfer the Goss H.V. printer to Standish. We shall address these two aspects of the Board's orders individually.

## A.

Section 10(c) of the NLRA explicitly empowers the Board to take "affirmative action including reinstatement of employees with or without backpay" upon finding that an employer has committed an unfair labor practice. *See* 29 U.S.C. § 160(c). In *NLRB v. Master Slack and/or Master Trousers Corp.*, 773 F.2d 77 (6th Cir.1985), we recognized that "[b]ackpay can be an appropriate remedy for a § 8(a)(5) violation." *Id.* at 83. We further explained that backpay "is a proper remedy where it serves to make whole employees for losses suffered due to an employer's failure to bargain, and also where it creates an incentive for an employer to bargain in good faith with the union representing the employees." *Id.*

■ In concluding that all employees laid off at the Standish plant should receive backpay, the Board relied upon *Lapeer Foundry and Mach., Inc.*, 289 N.L.R.B. No. 126, 129 L.R.R.M. (BNA) 1001 (1988). *See Adair Standish*, 292 N.L.R.B. at ——, 130 L.R.R.M. (BNA) at 1345. The Board's opinion in *Lapeer Foundry* established that "the decision to lay off employees for economic reasons is a mandatory subject of bargaining[,]" *Lapeer Foundry*, 289 N.L.R.B. at ——, 129 L.R.R.M. (BNA) at 1004, and held "that ordering the employer to bargain with the union concerning the lay-off decision, as well as the effect of the decision, and to *reinstate the laid-off employees with backpay* constitutes the appropriate remedy for this decision-bargaining violation." *Id.* at ——, 129 L.R.R.M. (BNA) at 1005 (emphasis added). The company argues that the Board's decisions in *Lapeer Foundry* and this case with regard to backpay signal an unwarranted change in prior Board policy as reflected in *Hanes*

*Corp.*, 260 N.L.R.B. 557, 109 L.R.R.M. (BNA) 1185 (1982). We disagree.

■ It is manifest " 'that the Board is free to adopt new rules of decision and that the new rules of law can be given retroactive application.' " *Shaw's Supermarkets, Inc. v. NLRB*, 884 F.2d 34, 37 (1st Cir. 1989). This proposition is limited only by the requirement that the Board must articulate rational justifications for altering its course when it chooses to do so. *See id.* at 36–37. In repudiating the limitation on backpay vaguely sketched in *Hanes*, the Board offered a lengthy discussion of its purpose in *Lapeer Foundry*:

We believe that the remedy requiring bargaining and full backpay relief furthers the purposes of the Act. This remedy provides an economic incentive for an employer to comply with the "rule that requires an employer to negotiate with the union before changing the working conditions in the bargaining unit ... [thereby] prevent[ing] the employer from undermining the union by taking steps which suggest to the workers that it is powerless to protect them." Furthermore, these discussions may result in less drastic alternatives being effected, or they may convince the union that the layoffs represent the only reasonable solution to the employer's economic problem. As bargaining may preclude the necessity of laying off employees, we find that backpay commencing on the date of the layoff is warranted to remedy a failure to bargain. In making this determination, we recognize that a reviewing court may question this award of full backpay in the absence of evidence demonstrating that bargaining would have prevented the layoffs. We do not require such a showing, however, for two reasons. First, requiring a finding that bargaining would have prevented the layoffs to justify a backpay order requires the Board or a court to engage in a post-hoc determination of the economic situation, instead of letting the parties decide themselves at the time of the layoff. This requirement thus unnecessarily injects the Government into an

area in which the collective-bargaining process should be permitted to function. Second, the requirement is contrary to our customary policy to order a respondent to restore the status quo when the respondent has taken unlawful unilateral action to the detriment of its employees. 289 N.L.R.B. at ——, 129 L.R.R.M. (BNA) at 1005–06 (citation omitted). The Board then expressly overruled *Hanes* in this case with citations to *Lapeer Foundry* and other decisions contrary to *Hanes*. *See Adair Standish*, 292 N.L.R.B. at ——, 130 L.R.R.M. (BNA) at 1345. The Board, therefore, has taken the necessary steps to reject *Hanes* in favor of a line of well-reasoned Board rulings. To require more specificity would only encroach impermissibly upon the Board's unassailable authority to clarify its own precedent. *Cf. NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 265–66, 95 S.Ct. 959, 967–68, 43 L.Ed.2d 171 (1975) ("The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of this important aspect of the national labor law would misconceive the nature of administrative decisionmaking.").

 Adair argues in the alternative that, even accepting *Lapeer Foundry* as valid and binding NLRB precedent, the Board erred in applying the decision retroactively to award backpay in this case. As we indicated in *Hickman Harbor Serv. v. NLRB*, 739 F.2d 214 (6th Cir.1984), however, "[u]nless manifest injustice can be shown, the Board's judgments on retroactivity should be upheld." *Id.* at 218; *accord Consolidated Freightways v. NLRB*, 892 F.2d 1052, 1058 (D.C.Cir.1989); *NLRB v. W.L. Miller Co.*, 871 F.2d 745, 748 (8th Cir.1989). "In determining whether manifest injustice is caused by the retroactive application of a Board rule we consider the

following: 'the reliance of the parties on preexisting law; the effect of retroactivity on accomplishing the purpose of the law; and any injustice arising from retroactive application.'" *NLRB v. Bufco Corp.*, 899 F.2d 608, 612 (7th Cir.1990).

Applying the factors identified in *Bufco*, we cannot say that the Board's retroactive application of *Lapeer Foundry* will result in manifest injustice in this case. First, Adair's reliance upon *Hanes* seems, at best, questionable. The seniority-based lay-offs and recalls of employees who received backpay in *Hanes* were described by the Board as "inevitable," [7] *see Hanes*, 260 N.L.R.B. at 557, 109 L.R.R.M. (BNA) at 1186, whereas Adair's unprincipled lay-offs based on subjective assessments of merit were neither proven to be essential nor confined to employees who would have been laid off if the company had applied an objective standard for ordering lay-offs. Second, the effect of retroactivity in accomplishing the NLRA's purpose is readily apparent. We observed in *Master Slack* that backpay as a remedy for an employer's failure to bargain "serves to make whole employees for losses suffered" and "creates an incentive for the employer to bargain in good faith...." *Master Slack*, 773 F.2d at 83. Retroactive application of *Lapeer Foundry* ensures that employers will have an impetus to bargain in close cases; a contrary result will only encourage intransigence in close cases, a result plainly at odds with the NLRA's emphasis upon dispute resolution through bargaining instead of litigation. Under the circumstances of this case, we do not find that the Board's retroactive application of *Lapeer Foundry* results in "manifest injustice." Therefore, we shall enforce the Board's remedial order insofar as it prescribes backpay for employees unilaterally subjected to lay-offs.[8]

7. The Board noted that the employer called back employees "unilaterally, but according to seniority and training." *See Hanes*, 260 N.L.R.B. at 557, 109 L.R.R.M. (BNA) at 1186.

8. We need not address in detail the argument advanced by Adair that its violations of section 8(a)(5) should not result in a backpay award because they provided the only available meth-

od for challenging certification. The company was able to obtain review of certification in this court irrespective of the multifarious violations at issue in this appeal. *See NLRB v. Adair Standish Corp.*, 875 F.2d 866 (6th Cir.1989). Moreover, the conduct underlying this case can hardly be described as a *de minimis* NLRA transgression undertaken solely to obtain review of certification.

**B.**

Adair's final challenge to the remedial order concerns the Board's directive that the Goss N.V. printer be moved to the Standish plant to replace the Suburban press shipped to Standish from Dexter. The Board fashioned the remedial order regarding the press to restore the status quo, which typically is the appropriate remedy for a discriminatorily motivated change in operations. *See, e.g., Woodline Motor Freight, Inc. v. NLRB*, 843 F.2d 285, 291 (8th Cir.1988). Adair has interposed two challenges to the Board's remedial order, however, that require us to deny enforcement of the press relocation order pending further development of the record. First, Adair asserts that the Suburban press which the company shipped to Standish in 1986 has been upgraded to the point that it presently is the functional equivalent of the Goss H.V. press in Dexter. If this is so, we need not enforce the press relocation order to restore the status quo, and enforcement would then be strictly and impermissibly punitive. *Cf. Armco, Inc. v. NLRB*, 832 F.2d 357, 365 (6th Cir.1987) (expressing concern that remedial order under review did more than " 'restore the situation, as nearly as possible, to that which would have occurred but for the violation.' "), *cert. denied*, 486 U.S. 1042, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988). Second, Adair claims that moving the Goss H.V. press to Standish (and the Suburban press currently in Standish to Dexter) will impose "an undue or unfair burden on the Company." *Fibreboard Paper Prods. Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). Although imposition of such an "undue or unfair burden" would relieve Adair of its obligation to transfer the Goss H.V. press, the record on this point is insufficiently developed to permit meaningful review at this juncture. Thus, we must VACATE the order to relocate the press and REMAND that aspect of the remedial order to the Board for further consideration. Adair's petition for review is DENIED and the order of the NLRB is ENFORCED with respect to all issues except the remedial order requiring Adair to deliver the Goss H.V. press to its Standish plant.