**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**COOK FAMILY FOODS, LTD., Respondent.**

Nos. 93–6488, 94–5386.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 3, 1994.

Decided Feb. 21, 1995.

Joseph Oertel (briefed), N.L.R.B., Office of the Gen. Counsel; and Aileen A. Armstrong, Deputy Associate Gen. Counsel, Howard E. Perlstein (briefed), and David A. Fleischer (argued), N.L.R.B., Appellate Court Branch, Washington, DC, for petitioner.

Kelvin C. Berens (argued and briefed), Mark McQueen, and Mark A. Fahleson, Berens & Tate, Omaha, NE, for respondent.

Before: KENNEDY, MARTIN, and NELSON, Circuit Judges.

DAVID A. NELSON, Circuit Judge.

The National Labor Relations Board has applied to this court for enforcement of orders entered by the Board in two separate administrative proceedings. In the first such proceeding the Board adjudicated charges that the respondent, Cook Family Foods, Ltd., committed unfair labor practices prior to a representation election held on September 20, 1991. The second proceeding arose from Cook's subsequent refusal to bargain with the International Brotherhood of Firemen and Oilers, the labor union certified by the Board as the winner of the election.

The first proceeding resulted in findings that Cook was guilty of several unfair labor practices. Only one of these findings is challenged here: a finding that three probationary employees said by the company to have been discharged for unsatisfactory performance on the job were in fact discharged for engaging in protected activities on behalf of the union. We are asked to decide whether the Board's resolution of the wrongful discharge question was supported by substantial evidence on the record as a whole.

Having examined the totality of the evidence, we conclude that the Board did not

have adequate support for its finding that Cook acted illegally in firing the three employees. We shall therefore deny enforcement of the Board's first order insofar as these employees are concerned, while granting enforcement otherwise.

The underlying question presented in connection with the second proceeding is whether the Board abused its discretion in refusing to grant Cook an evidentiary hearing on a claim that the results of the election were tainted by repeated acts of vandalism and intimidation by supporters of the union. We do not reach this question, the Board having conceded that the union did not win the election if the ballots of the three discharged employees are not to be counted.

Subsequent to oral argument the Board represented to us that Cook has been engaged in negotiations with the union. The Board contends that these negotiations operated as a waiver of Cook's objection to certification of the union as bargaining agent, notwithstanding that Cook and the union had expressly agreed that the company was not recognizing the union by negotiating with it. We conclude that there was no waiver. Accordingly, we shall deny the application for enforcement of the order in which Cook was directed to bargain with the union. Our ruling will have the effect of allowing another representation election to be held.

## I

In February of 1991, the administrative hearing record indicates, respondent Cook began processing "green" hams at a newly built plant in Grayson, Kentucky. Cook had previously performed this work at a plant in Hamtramck, Michigan.

Approximately 400 people were employed at the Grayson plant in the spring of 1991. More than 360 of these were bargaining unit employees. Among the people in the latter category were a woman named Toby Kouns, who was hired on May 3, 1991, and Patty Kouns, Ramona Martin, and Sharon McGinnis, all of whom were hired on May 13, 1991.

Three of the named individuals were discharged on June 14, 1991. There was a question as to whether the fourth, Sharon McGinnis, quit voluntarily or was discharged on that day as well. The union filed an unfair labor practice charge alleging that all four were fired illegally, but an administrative law judge ultimately dismissed the charge as to Sharon McGinnis, holding that she had resigned.

The record indicates that the first three weeks of an individual's employment at the Grayson plant were considered a training period. Newly hired workers were also told, in a handbook issued by Cook, that there would be a 13-week "trial period" during which the company would look closely at job performance and work behavior "to see if you will become a regular part of our 'Family'...."

The four women in question were trained to "bag" hams by tying nets over them as they came down a conveyor belt on a production line known as the curing line. There were typically eight people engaged in this work on the curing line, and each worker was expected to bag six to eight hams per minute.

During her first week on the job, Ramona Martin testified, one of her group leaders timed her at four to five hams per minute. By the time she was discharged, five weeks after she was hired, Ms. Martin was capable of bagging 10–14 hams per minute, according to her testimony. Patty Kouns had been timed at 10–11 hams per minute, Ms. Kouns testified, and there was testimony from Bill Griffith, a group leader, that after the four women completed their training period each of them was capable of doing a good job when she wanted to. The problem, according to Mr. Griffith, was that they often did not want to—particularly when their foreman, or "coordinator," was not in the vicinity.

On June 5, according to Group Leader Griffith, he saw these individuals—or three of them, at least[1]—slowing production down by letting hams go by without bagging them. He had seen this sort of behavior on their

1. Witnesses for the company were sometimes questioned about the performance of the four women as a group, and at other times they were asked only about the performance of the three whom the ALJ found were actually fired.

part before. The women would just stand and talk, said Griffith, each one holding a ham and doing nothing with it while other hams were allowed to go by unbagged.

Griffith testified that he asked the women if there was a problem and why they were not working. He further testified that he told them that it was necessary to keep production up and that they would have to keep bagging when the coordinator—a man named John Wenson—left the room. (Mr. Wenson was in charge of the receiving and grading operation, as well as the curing room, and his duties took him from one place to the other.) The women said nothing in response, according to Griffith, but they went back to work.

The same kind of production slowdown happened again, Griffith testified, on Thursday, June 6. Again the women slowed down their bagging as soon as John Wenson left the room, and again Griffith asked them if there was a problem. This time they told him that they were wet and cold, he said. His response was that "socks" had been ordered for the air conditioning vents so that cold air would not be blown directly out on the floor. The women's production improved after this exchange, Griffith testified.

The production problem recurred on Friday, June 7, according to Griffith: "as soon as John left the room, the ladies just stopped bagging altogether." Griffith said that he reported this fact to John Wenson and was told to go back and talk to the women.

Coordinator Wenson testified that he first became aware of the problem when Billy Griffith brought it to his attention on June 7. Wenson said that he then went up to the "pickle mezzanine," located a floor above the curing room, and observed the bagging line from the mezzanine. What he saw, he testified, was the four individuals talking and not doing much of anything. The other people on the line "were working a lot harder, trying to get everything done." Wenson testified that he then had Billy Griffith "counsel" the four individuals who were not working.

What Griffith told them on this occasion, according to Griffith, was that "we would have to keep production going, that we needed to get the picnics [picnic hams] bagged, even when John was out of the room." After he spoke with them, Griffith said, their production went up again.

On Monday, June 10, Griffith testified, the women again slowed down their bagging as soon as Wenson left the room. Upon his return Wenson asked Griffith what was going on, according to the latter's testimony, and Griffith responded that the same thing was going on. Again, Griffith said, he was told to go back and talk to the ladies, which he did.

Mr. Wenson testified that he noticed the curing line problem before lunch that day, some 900 picnic hams having accumulated, unbagged, in vats at the end of the line. The normal complement of unbagged hams was only one or two hundred.

Wenson then went to his immediate superior, Processing Manager David Bolio, and reported the problem to him. Bolio and Wenson went back to the pickle mezzanine together, according to the testimony of both men, and they saw the four individuals talking together and not doing their jobs. The other people on the line were working and trying to keep everything caught up. Bolio told Wenson that the situation was unacceptable and that Wenson had to have his group leaders counsel the four individuals who were not working. Wenson testified that he instructed Griffith to do so; that he saw Griffith walk up to the women; and that thereafter everything went fine for the remainder of the day.

Production proceeded smoothly on Tuesday, June 11, according to Griffith and Wenson, but not on Wednesday, June 12. After lunch that day, Wenson said, there were again 900 or 1000 unbagged hams at the end of the line.

Wenson said that Processing Manager Bolio and the plant manager, Les Johnson, were apprised of the problem. Bolio and Johnson went to the mezzanine, both men testified, where they observed that production ran smoothly when Wenson was in the curing room area. No hams went by unbagged. When Wenson left the area, Johnson testified, he saw the four individuals—

Patty, Toby, Sharon and Ramona—almost stop working. "I couldn't believe it," Johnson said. He timed them, and found, "giv[ing] them the benefit of the doubt," that "[t]hey were only bagging two-to-four picnics a minute."

When Wenson went back to the floor, Bolio testified, Johnson shouted down to him, "Hey, they're only bagging two per minute, what's going on?" The people on the curing line looked up at this point, and production ran smoothly the rest of the day.

Just before Sharon McGinnis clocked out at the end of her shift on June 12, Wenson testified, she apologized to him for not doing her job and getting him yelled at by his boss. Ms. McGinnis acknowledged, in her testimony, that she had apologized for working slowly that day.

There was a recurrence of the problem with the four women on June 13, Wenson testified. Again he got Dave Bolio involved. This time Bolio contacted Steve Wennerholt, the human resources director at the plant. Bolio and Wennerholt went to the mezzanine and, according to Wennerholt, saw production going very smoothly at first. Bolio then called Wenson off the production floor, Wennerholt testified, and shortly thereafter "the four people on the very front of the line[ ] literally stopped working. They just stopped working."

Wennerholt said he asked for the names of the four women in front, and was told they were Ramona Martin, Toby Kouns, Patty Kouns and Sharon McGinnis. "I said that this was unbelievable," Wennerholt testified, "and we can't have this. That we've got to fire these people."

The evidence showed that only the plant administrator, a man named Tim Messick, had final authority to fire anyone. Wennerholt testified that he ran into Messick after leaving the mezzanine and told him what was going on. "I was very upset," Wennerholt said. "I don't usually get real upset, but this really aggravated me that they would do this,

and I told Tim that in my opinion they should be fired."

Messick testified that Wennerholt was "highly agitated." Messick told him to calm down, make a thorough investigation, and get back to him after "mak[ing] sure we've got all our facts straight."

Wennerholt did conduct an investigation, he testified, speaking separately with Bill Griffith, Chris Hale (another group leader), John Wenson, Dave Bolio, and Les Johnson. Chris Hale told him, he said, that Ramona Martin was able to do the job but just wouldn't do it. She felt that Toby and Patty Kouns were getting up to where they should be, Wennerholt added, and were not as bad as Ramona.[2] At a subsequent meeting of Wennerholt, Wenson, Bolio and Johnson, the men unanimously decided to recommend that all four of the women be discharged. This recommendation was communicated to Messick at a meeting—not attended by Wenson—held late in the day on June 13. Messick was briefed on the details of the investigation, according to his testimony, and he gave instructions the following morning to let the four individuals go.

Sharon McGinnis, as it turned out, decided independently to quit. This decision was prompted, she testified, by the fact that she did not like the way Billy Griffith had talked to her on the 13th. On that occasion he had told her to go back to work as she and Patty Kouns were standing in line to wash their hands following a restroom break. Griffith asked "What's the problem," Ms. McGinnis testified, and he told her to "[c]ut the bullshit and go back to work." She denied that Griffith ever told her she was not working fast enough, but acknowledged that Chris Hale told her at one point that she was bagging only two hams a minute.

Ramona Martin testified that Billy Griffith and John Wenson had told Sharon McGinnis that she was only bagging two hams a minute. Ms. Martin also testified that Griffith used vulgarity in speaking to Ms. McGinnis.

---

**2.** Chris Hale testified that in her opinion the women's performance on the line did not justify any of them being fired. We note, however, that Chris Hale's husband, Carl Hale, had himself been fired. The ALJ determined that the discharge of Carl Hale was lawful.

Ramona Martin was notified of her dismissal by Human Resources Director Steve Wennerholt, who told her, she said, that she had slowed down production to two and one-half hams per minute. Her response, Ms. Martin testified, was "[t]hat's not true." (Wennerholt testified that she responded "[t]his is bullshit. You're firing me because I'm for the union.") Ms. Martin said that she asked to talk to the people who had timed her, but Wennerholt did not accede to this request.

Patty Kouns, when she was notified of her dismissal by Wennerholt, likewise denied having bagged only two hams per minute. When Wennerholt told her that he had timed her himself, she testified, she called him a liar. She went on to say, however, that it had been so cold on June 13 that her fingers were numb and she could hardly tie the bags. She further testified that she told Wennerholt, "You know the reason I am being fired is not because of my work"—a proposition to which, she said, Wennerholt did not respond.

In discharging Toby Kouns, according to the latter's testimony, Wennerholt told her that she seemed to be slowing up every time a coordinator went off the floor. Toby Kouns testified that she asked who had seen her, and was told it was Tim Messick, Les Johnson and Wennerholt himself. Mr. Wennerholt refused a request to let her confront Messick and Johnson, she testified, whereupon she asked for a chance to go back to work and prove herself. (The evidence is in conflict as to Wennerholt's response to the plea for a second chance, but it is clear that Toby Kouns was not taken back.) Toby Kouns also testified that she told Wennerholt she had been timed at doing more than 10 hams a minute; that Billy Griffith, who was present at the discharge, confirmed that she had been timed at this rate; and that another reason assigned by Wennerholt for the discharge was "the company [she kept]."

Toby Kouns testified that no one gave her any warnings, written or oral, prior to her discharge, and she said that Billy Griffith had never talked to her about how many hams she was bagging. Patty Kouns, similarly, testified that "company officials" never "counseled" her orally, prior to the discharge, about her job performance.[3] Ramona Martin likewise testified that prior to her discharge she was never counseled orally by any company official regarding the speed of her bagging. No one ever told her she was only bagging two hams a minute, Ms. Martin testified, and Billy Griffith never talked to her about how many hams she was bagging.

Griffith did not claim to have mentioned a specific number of hams per minute when he talked with the women on the line, but it is clear that he did speak to them repeatedly when their production flagged. This was confirmed by Chris Stone and Brenda Blake, among others, both of whom worked on the same line with the women who were ultimately fired.

Chris Stone testified that during the week of June 10 he watched Ramona Martin and Toby and Patty Kouns on the line every day; that unlike the other baggers, they would hold conversations in which they let a high percentage of hams go by unbagged; that the poor performance of these women made more work for others on the line, including him, and it made him mad; that he saw Billy Griffith approach the line and talk to the four ladies at least six or seven times; and that while he could not hear what was said, "the unbagged hams would decrease by a large amount" each time Griffith intervened.

Brenda Blake, similarly, testified that the job performance of Ramona Martin and Toby and Patty Kouns was poor; that they would slow down when there was no supervision; that the other baggers were up to standard, but these women "didn't do their work;" and that she saw Billy Griffith approach the line and talk with Ramona, Patty and Sharon,

---

**3.** Group leaders—including Bill Griffith, until he was promoted to the position of coordinator on June 12, 1991—were not classified as supervisors under the National Labor Relations Act. Presumably they were members of the bargaining unit themselves, and Group Leader Chris Hale was a prominent supporter of the union. It is doubtful whether group leaders would have been regarded as "officials" of the company. In any event, as the ALJ observed during the testimony of another witness, the question whether a person has been "counseled" is one that calls for a legal conclusion.

after which their performance "picked up drastically."

Brenda Blake said that she complained to John Wenson about the job performance of Ramona Martin and Toby and Patty Kouns, telling Wenson that she wanted to be transferred because "the rest of the people on the line were having to do their [own] work plus keep up with the ones that weren't working." Toby, Patty, Ramona, and Sharon were the only people on the line who did not do their share of the work, according to Ms. Blake.

Tim Dinkens, who testified that in June of 1991 he was spending about 50 percent of his workdays bagging hams, confirmed that Ramona Martin and Toby and Patty Kouns did a poorer job than anyone else. Every time he saw them, he testified, they would be talking among themselves and not bagging hams. Sometimes they were bagging, but most of the time they were not.

Notwithstanding the compelling evidence of poor performance by the women who were discharged, it was the contention of the union—a contention with which the General Counsel of the NLRB agreed—that they had been fired because of their activities on behalf of the union. The record shows that they had been members of a union organizing committee consisting of 25 or 30 people; that they distributed union handbills outside the plant, where company officials kept them under surveillance; that they circulated union organizing petitions; and that one of them (Patty Kouns) obtained the signature of a newly hired employee in the lunch room, while supervisory personnel were watching, two days before Steve Wennerholt told them that they were fired.

There was also evidence that Coordinator Wenson saw Ramona Martin, Patty Kouns, Toby Kouns, and Sharon McGinnis distributing union handbills on May 23, 1991; that Wenson was upset about this; and that he told someone—probably Billy Griffith—that he would throw a "bitch fit over the girls out handbilling." There was no evidence that he actually did so.

Extensive testimony was presented about efforts made by Ramona Martin to obtain certain material safety data sheets that manufacturers are required to maintain. The company apparently had difficulty in locating the particular data sheets she wanted.

Finally, there was evidence that on June 13, 1991, Ramona Martin asked to see Dave Bolio about the temperature on the curing line and about the postponement of a break; that Ms. Martin, Patty Kouns and Sharon McGinnis met with Bolio in the lunch room that afternoon; that they complained about how cold it had been, about the break, and about the speed at which the line was being operated; and that they told him their fellow workers on the line were "acting cold" toward them, which made them wonder if they were going to be fired. In response to the last comment, Ms. Martin testified, Bolio said, "No Ramona, they're not going to fire you. You all three are good workers." When Mr. Bolio took the stand, he was not asked whether or why he had said such a thing.

The ALJ concluded that the General Counsel had made a *prima facie* showing that the termination of the employment of the three women violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), under which it is an unfair labor practice to interfere with, restrain or coerce employees in the exercise of the organizational rights protected by § 7 of the Act, and also violated § 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), which prohibits discrimination in regard to tenure of employment where such discrimination is designed to discourage membership in a labor organization. The ALJ further concluded that the company had not shown that the three employees would have been discharged regardless of their union activities. The ALJ issued a recommended order directing the company to cease and desist from discharging or otherwise discriminating against its employees in order to discourage them from supporting the union; to cease and desist from committing other unfair labor practices in which the company was found to have engaged; and to take affirmative remedial action, including the reinstatement of Toby Kouns, Patty Kouns and Ramona Martin. A three member panel of the Board affirmed the ALJ's findings and conclusions and adopted his recommended or-

der. The application for enforcement followed.

## II

■ The threshold test for determining whether an employee's discharge constitutes an unfair labor practice is whether the discharge was motivated by "anti-union animus." See *NLRB v. Consolidated Freightways Corp. of Delaware*, 651 F.2d 436 (6th Cir.1981). The Board holds that the General Counsel has the burden of showing, by a preponderance of the evidence, that the employee's exercise of rights protected by § 7 of the Act "was a substantial or a motivating factor in the discharge." See *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983). Where such a showing is made, the employer can avoid being held in violation of §§ 8(a)(1) and 8(a)(3) if it proves—again by a preponderance of the evidence—"that the discharge rested on the employee's unprotected conduct as well and that the employee would have lost his job in any event." *Id.* (Approving *Wright–Line*, 251 NLRB 1083 (1980), *aff'd* 662 F.2d 899 (1st Cir.1981), *cert. denied*, 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982)).

■ Congress has told us that "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive." 29 U.S.C. § 160(e). Applying that standard here, we are constrained to accept the Board's conclusion that anti-union

animus was a factor in the discharge of Ramona Martin and Patty and Toby Kouns.[4] The Board rejected the company's contention that the discharge of the three women rested on their unsatisfactory performance and that they would have lost their jobs in any event. In our view, however, the evidence as a whole admits of no conclusion other than that the women would have lost their jobs whether or not they had been active on behalf of the union.

■ The ALJ found as a fact that Group Leader Griffith, contrary to his testimony, never "counseled" the women concerning their poor work. If the ALJ meant by this that Griffith never told the women to get back to work, the finding is simply not tenable. Even in credibility matters, "[a] reviewing court does not act . . . as a mere rubber stamp for the administrative agency. . . ." *YHA, Inc. v. NLRB*, 2 F.3d 168, 172 (6th Cir.1993) (quoting *Krispy Kreme Doughnut Corp v. NLRB*, 732 F.2d 1288, 1290 (6th Cir.1984)).[5] We must look at the evidence as a whole—and when we do so here, we find no room for doubt that the three women "from time-to-time failed to produce adequately," as the ALJ himself put it, and that Griffith repeatedly spoke with them about this.

Although the ALJ acknowledged that the three women sometimes failed to produce adequately, he asserted that other employees had similar failings. The record contains no support at all for this assertion. What the record shows, on the contrary, is that the other baggers on the curing line were consci-

---

4. The Board's anti-union animus conclusion rested not only on Coordinator Wenson's "bitch fit" remark of May 23—the utterance of which is a question of fact as to which we consider the Board's finding conclusive—but on several other circumstances as well. One such circumstance was a supposed statement to employees by Plant Administrator Messick that the plant would be moved back to Michigan if the union won the representation election. The company insists that the evidence as a whole does not support the finding that Messick made such a statement. The company does not ask us to deny enforcement of the portion of the Board's order that was predicated on the finding that Messick committed an unfair labor practice, however, and we are satisfied that anti-union animus was shown whether or not Messick's alleged threat is taken into account.

5. While recognizing that credibility determinations are generally left to the Board, this court has declared itself unwilling to uphold unfair labor practice findings that rest upon the uncorroborated testimony of persons who stand to receive backpay if the findings are upheld. See *NLRB v. Norbar, Inc.*, 752 F.2d 235, 241 (6th Cir.1985); *Union Carbide Corp. v. NLRB*, 714 F.2d 657, 661–62 (6th Cir.1983); *Delco Air Conditioning Div. v. NLRB*, 649 F.2d 390, 393 (6th Cir.1981). All of the testimony on which the ALJ relied here came from interested parties or the spouse of an interested party. All of the disinterested witnesses who testified on this point confirmed that the women who lost their jobs were slackers, and these witnesses generally confirmed that Griffith had words with the women when they failed to produce adequately.

entious in their work, while Ramona Martin *et al.* were not; that the dilatoriness of the latter meant more work for the former; and that the problem was so acute that one of the conscientious workers went so far as to request a job transfer.

The most significant element in the ALJ's thinking, his decision tells us, was that although Billy Griffith observed that Ramona, Patty, Toby and Sharon were "poor employees from the very date of their employment in mid-May," and although "their poor performance never ceased in the period from the date of their employment and training through early June, 1991, a period of 3 or 4 weeks," the plant administrator did not decide to fire them until June 14, two days after they were seen circulating a union petition and one day after they complained about the "frigid nature of the air conditioning on the production line...." (And, it might be added, one day after they complained about the coldness of their fellow workers, who had to work harder when these four slacked off.) Although everyone agrees that the four women in question were capable of good work, the ALJ seems to have felt that the company should have had the prescience to see that their willingness to work would never improve. If the company's motives had been pure, the ALJ thought, the women would have been fired during their initial training period and not a week or two after the training period had been completed.

We do not find this reasoning persuasive. The function of a training period, we should have thought, is to train—and there is no evidence that any of these women was untrainable. The function of a probationary period, we should have thought, is to permit an evaluation of the probationer's performance over time—and there is no evidence at all that in firing these women after they had been on the job five or six weeks (which was less than half of the prescribed 13–week probationary period), the company waited suspiciously long.

Consider the message that the ALJ's ruling would communicate to employers, should we let the ruling stand. "If you hire a union activist," the ruling teaches, "and if her job performance flags at any point while she is being trained or while she is still on probation, fire her immediately. Do not wait to see if her performance improves, and do not give her a second chance. Fire her at once—for if you do not, even if her performance deteriorates or fails to get better, you may never be able to fire her at all." We have difficulty reconciling such a message with the aims of the nation's labor laws.

Most of the evidence concerning the behavior of the women who were fired by Cook is not seriously contested. Although the women learned how to bag 10 or more hams per minute, there is overwhelming evidence that they repeatedly slowed down to a rate of no more than 2–4 hams, thereby imposing additional burdens on their fellow baggers. There is overwhelming evidence that the baggers who were saddled with the extra work did not like it. There is overwhelming evidence that Group Leader Griffith repeatedly spoke to the women when they slacked off, and that their performance picked up when he did so. There is overwhelming evidence that higher management officials observed the problem from the mezzanine and were very concerned about it. The ALJ dismissed these mezzanine observations as "high-level dumb-shows," staged for the purpose of "building a record" against "[f]our giggling, talkative employees," but there is not a shred of probative evidence to support the conclusion that management's concern was anything other than genuine. Being a union activist does not immunize anyone from the natural consequences of sub-standard performance, and the record of this case shows very clearly that the women would have been fired for sub-standard performance regardless of their union activities.

### III

By letter submitted to the court after oral argument, the Board informed us that a lawyer for Cook had advised an NLRB regional director that "we [Cook] have been meeting and negotiating with the Union since July of 1994 in an attempt to reach agreement...." Citing *Peabody Coal Co. v. NLRB*, 725 F.2d 357, 365 (6th Cir.1984), the Board suggested to us that "such bargaining operates as a

waiver of the Company's objections to the certification."

In its response, the company advised us that the only discussions between it and the union had been held on the shared understanding that the union would not thereby be accorded recognition. This understanding is memorialized in a writing, subscribed by Cook and the union, that provides as follows:

> "Representatives of Cook Family Foods and the International Brotherhood of Firemen & Oilers have agreed to meet to pursue settlement discussions. *Both parties to these settlement discussions agree that the Company is not recognizing the Union by these actions.* Further, both parties agree to maintain the confidentiality of these discussions until it is mutually agreed that they be made public." (Emphasis supplied.)

The settlement discussions undertaken here appear to be consistent with what the Board itself recommended in the proceedings reviewed in *Peabody Coal.* There the Board suggested that an employer challenging union certification should "consult" with the union prior to making unilateral changes. This court noted, without deciding the question, that even "limited recognition" of the sort envisioned by the Board "*may* be taken as a waiver of objection to union representation." *Id.* (Emphasis supplied.) In *Peabody Coal* we were not talking about consultations undertaken pursuant to an agreement that the union was not thereby being recognized, and we have been given no reason to suppose that such an agreement would not be effective.

## IV

The application for enforcement in Case No. 93–6488 is **DENIED** insofar as it pertains to the discharges and is **GRANTED** in all other respects. The application for enforcement in Case No. 94–5386 is **DENIED** for the reasons stated at the outset of this opinion.