**UFORMA/SHELBY BUSINESS FORMS, INC., d/b/a Miami Systems Corporation, Shelby Division, and CC Direct, a single integrated enterprise, Petitioner/Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent/Cross–Petitioner.**

Nos. 96–5170, 96–5350.

United States Court of Appeals, Sixth Circuit.

Argued March 20, 1997.

Decided April 23, 1997.

---

David K. Montgomery (argued), Paul D. Dorger (briefed), Keating, Muething & Klekamp, Cincinnati, OH, for Uforma/Shelby Business Forms, Inc., Shelby Division and CC Direct.

Joseph Oertel (argued and briefed), National Labor Relations Board, Office of the General Counsel, Washington, DC, Aileen A. Armstrong, Dep. Asso. Gen. Counsel, Charles P. Donnelly (briefed), National Labor Relations Board, Appellate Court Branch, Washington, DC, for National Labor Relations Board.

Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.

KENNEDY, Circuit Judge.

Petitioner Uforma/Shelby Business Forms, Inc. appeals the decision of the National Labor Relations Board ("Board"), which affirmed the decision by the Administrative Law Judge ("ALJ") that petitioner violated the National Labor Relations Act, 29 U.S.C. §§ 151 et seq. ("NLRA"). For the following reasons, we REVERSE the ruling that petitioner violated §§ 158(a)(1), (a)(5) by not providing prior notice or opportunity to bargain before eliminating employees, REMAND for further proceedings consistent with this opinion claims under §§ 158(a)(1), (a)(3) that petitioner threatened to eliminate, and later eliminated, employees in retaliation for protected union activity, and AFFIRM the ruling that petitioner violated § 158(a)(1) by threatening adverse action for attempts at unionization.

## I.

Petitioner, a corporation which produces printed business forms, maintains a facility in Shelby, Ohio. A local chapter of Graphic Communications International Union, AFL–CIO ("the union") represents a unit of production and maintenance employees at the Shelby facility. During the time period relevant to this lawsuit, the union and petitioner maintained a collective bargaining agreement which was effective from June 1, 1992 to June 1, 1994.

On August 31, 1993, the General Counsel for the Board ("General Counsel") filed an amended complaint consolidating prior unfair labor practice charges filed against petitioner by the union. The General Counsel alleged that petitioner had violated the NLRA, 29 U.S.C. §§ 158(a)(1),(a)(3),(a)(5), by threatening the union, retaliating for protected union activity, and bargaining in bad faith. On January 31 and February 1, 1994, the ALJ held a hearing on the charges, at which the following evidence emerged:

In 1992, petitioner began to assign salaried employees who were not members of the union to perform work as the assistant foreman for the third shift at the Shelby plant. On July 20, 1992, the union filed a grievance alleging that the collective bargaining agreement required petitioner to assign a union employee to the position. Petitioner denied the grievance at the first and second steps.

On October 20, 1992, union representatives Dan Reese and Mike Lybarger met

with Beulah Pifer, the manager of human resources for petitioner, to discuss the grievance. Reese and Lybarger testified that Pifer told them that William O'Bryan, the general manager for petitioner, "blew up" when she had mentioned the grievance and informed Pifer that he would "eliminate the problem" if she could not "take care" of the grievance. When Lybarger asked her if this meant that petitioner would eliminate the third shift if the union pursued the grievance, Pifer responded that it was a possibility.

On October 27, 1992, Reese and Lybarger and union president Virgil Porter again discussed the grievance with Pifer and plant manager Eric Vail. Lybarger and Reese testified that Vail stated that if the union pursued the grievance, O'Bryan could relocate some union work to other plants, thereby providing a justification for later eliminating the third shift. Vail also stated that when union members voted on whether to pursue the grievance regarding the third shift to arbitration, union officers should inform them about the importance of the issue and advise them on how to vote.

On November 12, 1992, the union executive board debated whether to arbitrate the grievance. Although Reese and Lybarger told them that petitioner might eliminate the third shift if the union pursued the grievance, the board issued a recommendation to employees to vote to proceed to arbitration. On November 15, 1992, twenty to thirty union members voted. Although Lybarger warned them about the possible consequences, the members voted to proceed.

Because only a third of unit members had voted, however, and because some members expressed concern about pursuing arbitration, Reese and Lybarger told Vail and Pifer that the union would like to hold another vote, and requested that petitioner not take any action until after the second vote. Lybarger testified that Vail responded that, because Reese and Lybarger were union officers, they "could persuade the vote and try to take care of the problem."

On December 13, 1992, the union membership again voted to pursue the grievance. The next day, Vail told Reese and Lybarger that petitioner was eliminating the third shift immediately. Petitioner acted without providing prior notice or opportunity to bargain collectively. Petitioner moved twelve of the third-shift employees to the other two shifts and terminated the remaining five workers. The elimination of the third shift also resulted in the termination of Reese as other employees exercised their seniority rights, although he had not been part of that shift.

Petitioner introduced evidence at the hearing that, shortly before the lay offs, it had lost 1.2 million dollars in annual revenue because it had lost two lucrative contracts with J.C. Penney and the State of Ohio. It also introduced evidence that it had begun to consider eliminating the third shift for economic reasons in April, 1992, and that it had laid off other employees in November and December of 1992 to reduce labor and overhead costs.

Vail testified that he did not threaten to eliminate the third shift if the union pursued its grievance. He also stated that petitioner previously had eliminated the third shift without incident, and that closing the shift reduced labor costs and did not increase overtime hours significantly. Finally, he asserted that petitioner had attempted to respond to declining business by withdrawing several bids in late 1992 in order to save costs.

In 1993, petitioner purchased CC Direct, a company in Pennsylvania, and moved the operation, including twelve employees, to the Shelby facility. Reese and Lybarger met with Pifer in March, 1993 to discuss the desire of the union to organize the twelve new employees. Lybarger and Reese testified that Pifer told them that the union should not attempt to organize the new workers because petitioner might respond by removing the CC Direct work from the Shelby plant. Although the union later attempted to represent the new employees, petitioner did not remove the work.

The ALJ determined that petitioner had violated the NLRA by (1) threatening to eliminate the third shift if the union pursued its grievance; (2) eliminating the third shift in retaliation for having pursued the griev-

ance; (3) terminating Dan Reese for similar reasons; (4) failing to provide notice and an opportunity to bargain before eliminating the third shift; and (5) threatening to relocate work from the plant if the union attempted to organize the employees acquired from CC Direct. The ALJ rejected the assertions by petitioner that it eliminated the shift for business reasons, that the collective bargaining agreement allowed it to eliminate the shift without prior notice or bargaining, and that the statements of Pifer during the March, 1993 meeting were too ambiguous to constitute threats. The ALJ also rejected the argument by petitioner that statements by Vail and Pifer during their discussions with Reese and Lybarger were inadmissible as settlement discussions.

Petitioner appealed to the Board, which largely affirmed the findings and conclusions of the ALJ and adopted without discussion most of the opinion issued by the ALJ. The Board did note that the ALJ had made certain factual errors when assessing the evidence provided by petitioner in support of its claim that it eliminated the third shift for economic reasons. The Board nonetheless upheld the credibility findings and ultimate conclusions of the ALJ on the basis of the other evidence. The Board further declined to review whether the lay off of Reese represented an independent violation of the NLRA because it determined that his lay off was linked inextricably with the illegal elimination of the third shift.

Petitioner has filed a timely appeal of the rulings by the Board, and respondent has filed a cross-appeal seeking to enforce them. We have jurisdiction pursuant to 29 U.S.C. § 160(f).

## II.

### A.

■ Before petitioner eliminated the third shift, it neither provided notice to, nor attempted to bargain with, the union. Petitioner claims that the terms of its collective bargaining agreement with the union allowed it to take such unilateral action.

■ A union has the statutory right to bargain over "wages, hours, and other terms and conditions of employment," *see* 29 U.S.C. § 158(d), and an employer may not alter unilaterally a condition of employment which is the subject of mandatory bargaining. *See id.* at §§ 158(a)(1),(a)(5); *see also First Nat'l Maintenance Corp. v. NLRB*, 452 U.S. 666, 674–75, 101 S.Ct. 2573, 2578–79, 69 L.Ed.2d 318 (1981); *Litton Microwave Cooking Prods. Div., Litton Sys., Inc. v. NLRB*, 868 F.2d 854, 857 (6th Cir.1989). Although a union can waive its statutory right to bargain, such a waiver must be "clear and unmistakable." *See Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983). Because the decision to lay off is a mandatory subject of bargaining, *see, e.g., Adair Standish Corp. v. NLRB*, 912 F.2d 854, 864 (6th Cir.1990), petitioner was able to terminate the third shift, reschedule certain employees, and lay off others without prior notice or bargaining only if the bargaining agreement at issue clearly and unmistakably so provided.

After reviewing the terms of the agreement, the ALJ concluded, and the Board agreed, that "[t]here was no clear and unmistakable waiver to bargain over the elimination of the third shift" because "management's right to eliminate a shift is not specifically enumerated as one of the rights of management." *See Uforma/Shelby Business Forms, Inc.*, 320 N.L.R.B. 71, 74, 1995 WL 789964 (1995).

■ The General Counsel suggests that we should affirm the Board's interpretation of the collective bargaining agreement because substantial evidence supports it. The General Counsel, however, misconstrues the standard of review. In *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991), the Supreme Court held that, "[a]lthough the Board has occasion to interpret collective-bargaining agreements in the context of unfair labor practice adjudication, the Board is neither the sole nor the primary source of authority in such matters." *Id.* at 202, 111 S.Ct. at 2223(citation omitted). Rather, arbitrators and federal courts are the principal interpreters of collective bargaining agreements, *see id.*, and courts do

not defer to interpretations offered by the Board. *See id.* at 203, 111 S.Ct. at 2223–24; *see also Bonnell/Tredegar Indus., Inc. v. NLRB,* 46 F.3d 339, 343 (4th Cir.1995) (under *Litton,* courts extend no special deference to interpretation by Board of collective bargaining agreement); *McDonnell Douglas Corp. v. NLRB,* 59 F.3d 230, 234 (D.C.Cir. 1995) (holding the same); *Cedar Valley Corp. v. NLRB,* 977 F.2d 1211, 1215 (8th Cir.1992) (under *Litton,* courts review *de novo* any contract interpretation of Board). We therefore will interpret independently the terms of the bargaining agreement at issue.[1]

The "Management Rights" section of the collective bargaining agreement provides in pertinent part:

4–1 The management of the Company and the direction of the working force, including the right to plan, direct and control Plant operations; *to schedule and assign work to employees; to establish and determine job duties and the number of employees required thereof;* to determine the means, methods, processes, schedules and standards of production; to determine the products to be manufactured; the location of its Plants, and the continuance of its operating departments; to subcontract work; to establish and require employees to observe Company rules and regulations; *to hire, layoff or relieve employees from duties;* to maintain order and to suspend, demote, discipline and discharge employees for just cause; *are the sole rights of the Company* (emphasis added).

We cannot agree with the Board that the above language fails to "clearly and unmistakably" provide that petitioner had the right to abolish the third shift, reschedule twelve employees to different shifts, and lay off five other employees without first providing notice and opportunity to bargain. Although the language does not state that petitioner may "eliminate a shift," it reserves to petitioner the exclusive ability to schedule and assign work, determine the number of employees required for a job, and layoff or

relieve employees from duties. These broad powers necessarily encompass the ability to reschedule and lay off the members of a given shift, regardless of whether petitioner is affecting one or one hundred employees. The reasoning of the ALJ exalts form over substance by suggesting that collective bargaining agreements must catalog every conceivable permutation of a decision to lay off, such as delineating with precision each position or work force percentage which an employer may reschedule or lay off.

Prior precedent supports our conclusion. In *Litton Microwave Cooking Prods. Div., Litton Sys., Inc. v. NLRB,* 868 F.2d 854 (6th Cir.1989), the employer relocated production and consequently decreased its work force at a particular plant. The *Litton Microwave* court reversed the finding of the Board that the employer had violated its collective bargaining agreement by refusing to bargain over the transfer of production. *See. id.* at 857. Holding that the union clearly and unmistakably had waived its right to bargain, the *Litton Microwave* court relied upon language in the management rights clause of the agreement, which reserved for the employer the right "to transfer, and to determine the size of work force, layoffs, product and production methods." *See id.* at 857–58. The management rights clause therefore allowed the employer to avoid bargaining because its language was so broad, *see id.* at 857, not because, as the Board would require, it identified in detail the particular decision taken by the employer. Because the management rights clause in this case closely resembles the contractual language present in *Litton Microwave,* it provides petitioner with the same degree of decision-making flexibility.

The General Counsel emphasizes that in *Tocco Div. of Park–Ohio Indus., Inc. v. NLRB,* 702 F.2d 624 (6th Cir.1983), this court upheld a ruling by the Board that a union had not waived its right to bargain over the relocation of work. In *Tocco,* however, the contractual provision upon which

1. We do not address the issue of whether a different standard of review should apply if the Board appropriately referred to extrinsic evidence when interpreting a collective bargaining agreement. In this case, the Board based its construction of the collective bargaining agreement solely upon its written provisions.

the employer relied merely stated that, "[i]n the event the company *determines* to ... close or transfer a Tocco–Cleveland department or operation, or a crankshaft or camshaft department or operation, in whole or in part, Severance Allowances will be payable...." *See id.* at 628 (emphasis in original). As the *Tocco* court explained, this language was equivocal. *See id.* It only described the consequences of a prior decision to transfer work; unlike the bargaining agreement in this case, it failed to state that the employer retained the sole right to make the contested decision. Further, the examples provided by the *Tocco* court of language which the Board has held to reveal a union waiver, such as a provision that "the employer shall have the exclusive right to at all times, change, modify, or cease its operations, processes, or production," track the broad language at issue in this case. *See id.* at 628 n. 2 (citing *Consolidated Foods Corp.*, 183 N.L.R.B. 832 (1970); *International Shoe Co.*, 151 N.L.R.B. 693 (1965)).

Although the Board construed the bargaining agreement without reference to any extrinsic evidence, we note that the record supports our interpretation of the agreement. Prior to the incident at issue, petitioner twice terminated the third shift. Nothing in the record, however, indicates that the union demanded bargaining on those occasions. This acquiescence suggests that the union previously has acknowledged the ability of petitioner to terminate the third shift without prior notice or bargaining. *See Litton Microwave*, 868 F.2d at 858 (history of relationship between union and employer indicated that union believed that it had waived its right to bargain over relocation of production).

The collective bargaining agreement therefore provided petitioner with the right to terminate the third shift without prior notice or bargaining. Because the Management Rights section alone provided this power, we do not address the claims by petitioner that the union also waived its right to notice and opportunity to bargain through other sections of the agreement.

**B.**

 Under the NLRA, it is an unfair labor practice to lay off, or threaten to lay off, employees in order to discourage or retaliate for protected union activities. *See, e.g.*, 29 U.S.C. §§ 158(a)(1), (a)(3); *NLRB v. Hovey Elec., Inc.*, 964 F.2d 543, 546–47 (6th Cir.1992).[2] In many cases involving a claim that an employer pursued an adverse action in order to discriminate against union activity, the evidence will suggest that the defendant may have acted on the basis of both anti-union animus and legitimate reasons. The following methodology applies to such "dual motivation" cases:

> In a case involving lay-offs, the General Counsel must prove that anti-union animus partially motivated or contributed to the lay-off decision. If this prima facie case is established, then the employer must show by a preponderance of the evidence that the employees would have been laid-off even if they had not engaged in protected activity.

*NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1477, *amended by*, 997 F.2d 1149 (6th Cir.1993) (quoting *Birch Run Welding & Fabricating, Inc. v. NLRB*, 761 F.2d 1175, 1179 (6th Cir. 1985)). This framework requires the General Counsel to prove by a preponderance of the evidence that protected union activity "was a substantial or a motivating factor in the discharge[s]." *See NLRB v. Cook Family Foods, Ltd.*, 47 F.3d 809, 816 (6th Cir. 1995) (quoting *NLRB v. Transportation Management Corp.*, 462 U.S. 393, 400, 103 S.Ct. 2469, 2473–74, 76 L.Ed.2d 667 (1983)). A response by the employer that it would have laid off the workers even in the absence of any protected union activity constitutes an affirmative defense, *see Vemco*, 989 F.2d at 1482; typically, an employer will attempt to prove this defense by asserting that it had a legitimate business reason for the discharges. *See id.*

---

**2.** A discriminatory threat to discharge violates § 158(a)(1), *see Hovey*, 964 F.2d at 546, whereas a discriminatory discharge violates both §§ 158(a)(1) and (a)(3). *See NLRB v. Vemco, Inc.*, 989 F.2d 1468, 1476, *amended by*, 997 F.2d 1149 (6th Cir.1993).

"The question of employer motivation for layoffs is a factual question reviewed under the 'substantial evidence' standard of 29 U.S.C. § 160(e)." *Hovey,* 964 F.2d at 547. We therefore must enforce a finding of improper motive when substantial evidence supports it, even if we would have decided the issue differently upon *de novo* review. *See W.F. Bolin Co. v. NLRB,* 70 F.3d 863, 871 (6th Cir.1995); *NLRB v. Price's Pic–Pac Supermarkets, Inc.,* 707 F.2d 236, 240 (6th Cir.1983). We generally defer to the credibility determinations of the Board, and "will not normally substitute [our] judgment for that of the Board or administrative law judge who has observed the demeanor of the witnesses." *NLRB v. Lakepark Indus., Inc.,* 919 F.2d 42, 44 (6th Cir.1990). Nonetheless, we do not function as a "mere rubber stamp" for the factual and credibility determinations made below, *see, e.g., Cook Family Foods,* 47 F.3d at 816, and we must evaluate the entire record and acknowledge any evidence which undermines the particular decision of the Board. *See Bolin,* 70 F.3d at 870.

In this case, the ALJ concluded that petitioner had violated §§ 158(a)(1) and (a)(3) by eliminating the third shift in order to retaliate against the union for having pursued its grievance.[3] The conclusion of the ALJ rested upon a rejection of petitioner's defense that it eliminated the third shift due to business reasons. *See Uforma/Shelby Business Forms,* 320 N.L.R.B. at 77. Specifically, the ALJ determined that the economic justification proffered by petitioner was pretextual because 1) the timing of the decision was suspicious; 2) although petitioner had lost business prior to eliminating the shift, a new contract with the State of New Jersey had "made up for" this loss; 3) exhibits reflecting hours worked at the plant between

October, 1992 and December, 1993 demonstrated that there was no lack of work; and 4) William O'Bryan, who decided to eliminate the third shift, did not know how much money the elimination had saved petitioner. *See id.*

The Board upheld the decision of the ALJ, *see id.* at 71–72,[4] although it admitted that the ALJ mistakenly had found that the $173,000 in increased revenue from petitioner's contract with the State of New Jersey equalled the loss of $1.2 million in annual revenue which petitioner suffered when it lost its contracts with J.C. Penney and the State of Ohio. *See id.* at 71 n. 3. The Board further noted that the ALJ incorrectly had described the records regarding work hours as showing the amount of hours actually worked; in fact, those records only reflected projected work hours. *See id.* The Board nonetheless determined that these errors would not have affected the judge's finding that petitioner eliminated its third shift for discriminatory reasons. *See id.*

We cannot agree. These errors may well have prevented the ALJ from accurately assessing the remaining evidence. He may have reached a different decision if he had not misconstrued evidence, especially the evidence of lost revenue, crucial to the defense of petitioner.[5] Further, the record contains evidence which the ALJ apparently did not consider, such as evidence that petitioner also laid off employees on November 30 and December 9, 1992. Although there is evidence to support the position of the Board, the errors committed by the ALJ are significant enough when added to his erroneous construction of the bargaining agreement to suggest that he might have ruled differently in their absence.

---

3. Similarly, the ALJ found that petitioner had violated § 158(a)(1) by first threatening the union that it would eliminate third shift if the union pursued the grievance.

4. The Board, however, stated that it was not deciding whether the layoff of Reese constituted an independent violation of the NLRA because it found that his layoff was "inextricably intertwined with the unlawful elimination of the third shift." *See id.* at 71.

5. The relevance of the projected work hours is unclear. As noted, the numbers do not represent actual hours worked, and the record contains evidence that work projections were unreliable. Although a projection by petitioner could reveal its expectations of future business, the record does not indicate which schedules petitioner compiled during the time of the lay offs at issue.

In *NLRB v. Norbar, Inc.,* 752 F.2d 235 (6th Cir.1985), the ALJ and the Board had found that the defendant had violated § 158(a)(3) by discharging an employee in retaliation for his union activities. The *Norbar* court, however, observed that the ALJ had made "scant reference" to important facts bearing on the intent of the defendant, *see id.* at 242, and noted that the ALJ had made several significant errors when examining the reasons behind the discharge. *See id.* at 242–43. Accordingly, the *Norbar* court remanded the retaliation claim to another ALJ for new hearing. *See id.* at 243.

As in *Norbar*, the findings by the ALJ in this case regarding the reasons for the elimination of the third shift were predicated upon significant factual errors which, if corrected, may lead to a different result. We therefore follow *Norbar* and remand for a new hearing on this claim before a different ALJ.[6] We likewise remand the related claim that petitioner violated § 158(a)(1) by twice threatening to eliminate the third shift because resolution of that claim turns heavily upon the resolution of the parties' dispute as to why petitioner ultimately eliminated the third shift.

## C.

■ Petitioner claims that Federal Rule of Evidence 408 barred admission of evidence that Vail and Pifer indicated during their discussions with Lybarger and Reese that petitioner would terminate the third shift if the union pursued its grievance. Petitioner bases this claim upon the fact that Vail and Pifer made the alleged statements during negotiations intended to resolve the grievance.[7] Because these statements will be crucial to resolving the remanded claims, we address whether Rule 408 might exclude them.

Rule 408 provides in its entirety:

> Evidence of (1) furnishing or offering or promising to furnish, or (2) accepting or offering or promising to accept, a valuable consideration in compromising or attempting to compromise a claim which was disputed as to either validity or amount, is not admissible to prove liability for or invalidity of the claim or its amount. Evidence of conduct or statements made in compromise negotiations is likewise not admissible. This rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations. This rule also does not require exclusion when the evidence is offered for another purpose, such as proving bias or prejudice of a witness, negativing a contention of undue delay, or proving an effort to obstruct a criminal investigation or prosecution.

FED.R.EVID. 408.

Although the literal language of Rule 408 broadly declares that "[e]vidence of conduct or statements made in compromise negotiations is likewise not admissible," courts have held that

> Rule 408 is . . . inapplicable when the claim is based upon some wrong that was committed in the course of the settlement discussions; e.g., libel, assault, breach of contract, *unfair labor practice*, and the like. . . . Rule 408 does not prevent the plaintiff from proving his case; wrongful acts are not shielded because they took place during compromise negotiations.

23 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5314 (1st ed. 1980) (emphasis added) (footnotes omitted). The inapplicability of Rule 408 to suits seeking to vindicate wrongs committed during settlement discussions derives from the more general principle that "Rule 408 only bars the use of compromise evidence to prove the validity or invalidity of the claim that was the

---

**6.** Because the Board concluded that the layoff of Reese was inextricably intertwined with the elimination of the third shift, our remand necessarily encompasses the question of whether petitioner violated the NLRA by laying off Reese.

**7.** Petitioner does not claim that Rule 408 also bars evidence of the alleged threat by Pifer in March, 1993 that petitioner would move the CC Direct employees to another plant if the union tried to organize them. This statement by Pifer did not occur during any discussions intended to resolve an outstanding grievance.

subject of the compromise, not some other claim." *Id.* at n. 25. Evidence of the compromise of a claim different than the claim currently in dispute therefore is admissible unless "the compromise evidence require[s] an inference as to the offeror's belief concerning the validity or invalidity of the compromised claim." *See id.* at § 5308.

In this case, the General Counsel did not attempt to introduce evidence of the alleged threats in order to prove the validity of the grievance which served as the subject of the negotiations. Similarly, the General Counsel did not need to prove that the grievance was in fact a meritorious one in order to succeed on its unfair labor practices claims. The General Counsel instead sought to introduce the evidence in order to demonstrate that, regardless of the legitimacy of the grievance, petitioner threatened, and subsequently retaliated against, the union for pursuing it.

Accordingly, we hold that Rule 408 does not exclude evidence of alleged threats to retaliate for protected activity when the statements occurred during negotiations focused on the protected activity and the evidence serves to prove liability either for making, or later acting upon, the threats. *See Vulcan Hart Corp. (St. Louis Div.) v. NLRB,* 718 F.2d 269, 277 (8th Cir.1983) (Rule 408 did not bar evidence of demand during negotiations to settle grievance that employee resign his union office when General Counsel did not seek to prove validity of grievance). The fact that Rule 408 does not bar admission of the evidence, however, of course does not indicate that the statements at issue are in fact threats. *See also Jenmar Corp. of Utah, Inc.,* 301 N.L.R.B. 623, 631 n. 6, 1991 WL 26129 (1991) (although Rule 408 bars evidence proving the merits of the subject of settlement discussions, employer could introduce evidence that it offered to reinstate employee as a defense to unfair labor practice charge based on its subsequent discharge of employee); *Michigan Precision Indus., Inc.,* 223 N.L.R.B. 892, 893, 1976 WL 6881 (1976) (threats to refuse to rehire em-

ployee unless he dropped unfair labor practice charges were not excluded by Rule 408).[8]

### D.

■ Finally, petitioner argues that substantial evidence fails to support the finding by the ALJ that it violated § 158(a)(1) when Pifer threatened Lybarger and Reese in March, 1993 that petitioner would remove work if the union attempted to organize the employees recently acquired from CC Direct. Petitioner asserts that the statements by Pifer were too ambiguous to constitute threats, and further emphasizes that it did not remove the CC Direct employees even though the union later attempted to unionize them.

■ An employer violates § 158(a)(1) when its "conduct tends to be coercive or tends to interfere with the employees' exercise of their rights." *Adair Standish Corp. v. NLRB,* 912 F.2d 854, 859 (6th Cir.1990) (quoting *NLRB v. Okun Bros. Shoe Store, Inc.,* 825 F.2d 102, 105 (6th Cir.1987)). "[T]he actual effect of a statement is not so important as is its tendency to coerce." *Okun Bros. Shoe Store,* 825 F.2d at 107. We will uphold a finding of a violation if the employees reasonably could have concluded that the employer was coercing them. *See Adair Standish,* 912 F.2d at 860; *see also Indiana Cal–Pro, Inc. v. NLRB,* 863 F.2d 1292, 1298 (6th Cir.1988) (statements by employer regarding unionization are not protected opinions if "their reasonable tendency is coercive in effect"). When determining whether comments are coercive threats, the Board considers "the effect of the remarks from the point of view of those whose livelihood may depend upon them," *Indiana Cal–Pro,* 863 F.2d at 1299, in order to pick up implications intended by employers "that might be more readily dismissed by a more disinterested ear." *Id.* (quoting *Peabody Coal Co. v. NLRB,* 725 F.2d 357, 363 (6th Cir.1984)). As noted, we must uphold the factual determinations of the Board when substantial evidence supports them. *See, e.g., Adair Standish,* 912 F.2d at 859.

8. We have assumed that Rule 408 applies to the meetings at issue. It is unclear whether the language in Rule 408 regarding "compromise negotiations" is broad enough to encompass meetings between company and union representatives who were not lawyers and who were discussing the resolution of a grievance.

The ALJ based his ruling upon the testimony by Lybarger and Reese. Lybarger testified that, during their meeting to discuss the possibility of unionizing the new employees, Pifer told them that "you better back off; if you push [the] situation [petitioner] could take the work elsewhere." *Uforma/Shelby Business Forms*, 320 N.L.R.B. at 78. After Lybarger asked her whether this was a threat, Pifer responded that "[t]hat's the way these people do business." *Id.* The ALJ further found that Reese corroborated the testimony of Lybarger by stating that Pifer informed them that they "should really kind of back off on this CCD thing," adding that "you know how these people are." *Id.*[9] The ALJ also noted that no witnesses testified on behalf of petitioner on this issue. *See id.*

■ The above testimony constitutes substantial evidence supporting the ruling of the ALJ. Although Pifer did not announce unequivocally that petitioner would retaliate against unionization efforts, her comments, especially her response to Lybarger's inquiry as to whether petitioner was threatening to remove work, allowed Lybarger and Reese to believe reasonably that petitioner would retaliate against attempts at unionization. *See Indiana Cal-Pro*, 863 F.2d at 1298 (indicating that a "veiled threat of retaliation" may constitute a violation of § 158(a)(1)). The fact that petitioner never enforced its threat does not shield it from liability: under § 158(a)(1), the threat itself is the actionable wrong. Further, petitioner never dissipated the coercive effect of the threat by repudiating it. *See, e.g., Passavant Memorial Area Hosp.*, 237 N.L.R.B. 138, 138–39, 1978 WL 7798 (1978) (identifying remedial steps an employer may take to avoid liability for prior coercive threat). To the extent that petitioner may be arguing that its subsequent inaction is evidence that it in fact never made a threat, the unrebutted testimony of Reese and Lybarger nonetheless provides substantial evidence supporting the conclusion of the ALJ.

### III.

Accordingly, we REVERSE the ruling that petitioner violated §§ 158(a)(1),(a)(5) by not providing prior notice or opportunity to bargain before eliminating workers. We REMAND for further proceedings consistent with this opinion the claims under §§ 158(a)(1),(a)(3) that petitioner threatened to eliminate, and later eliminated, workers in retaliation for protected union activity. Finally, we AFFIRM the ruling that petitioner violated § 158(a)(1) by threatening adverse action for attempts at unionization.

---

**9.** The record also demonstrates that Reese testified that Pifer told them that "there was a possibility that the CCD could be removed from here if we pursued the issue."